[Crim. No. 1597.  In Bank.—June 20, 1911.]

## THE PEOPLE, Respondent, v. JOHN BYRNE, Appellant.

CRIMINAL LAW—JUDGMENT OF CONVICTION—REFUSAL OF NEW TRIAL—
NEWLY DISCOVERED EVIDENCE—DISCRETION.—After judgment of con-
viction in a prosecution for murder, an order refusing to grant a
motion for a new trial on the ground of newly discovered evidence is
conclusive on the appellate court, in the absence of a clear showing
of abuse of discretion.  In the present case, after a review of the
evidence, it is held that no such abuse of discretion appears.

ID.—DUE DILIGENCE TO PRODUCE EVIDENCE AT TRIAL.—A party relying
upon newly discovered evidence as a ground for a new trial must
have made reasonable effort to produce all his evidence at the trial,
and will not be allowed a new trial for the purpose of introducing
evidence known to him and obtainable at the time of the trial, or
which would have been known to him had he simply exercised reason-
able effort to present his defense.

ID.—WEIGHT OF EVIDENCE—TRUTH AND MATERIALITY.—When due dili-
gence on the part of defendant to produce at the trial all evidence
in his favor has been shown, the trial judge is still called upon, in
the exercise of a wise discretion, to determine the weight to be given
to the evidence produced upon the motion for a new trial, the truth
of the matters shown thereby, and the materiality and probability
of the effect of them if believed to be true.

ID.—COUNTER AFFIDAVITS ADMISSIBLE ON MOTION.—Counter affidavits to
rebut the showing made by defendant on such a motion, by dis-
crediting the newly discovered witnesses, or by disputing the alleged
facts testified to by the new witnesses, may be presented on the
motion.

ID.—EVIDENCE—ACCUSATORY STATEMENTS—SILENCE OF DEFENDANT—
WEIGHT OF EVIDENCE.—Evidence of an accusatory statement made
in the presence and hearing of the defendant, after he had been
taken into custody by the police, but before he had been formally
arrested for the crime for which he was afterwards tried, to which
he remained silent, is admissible as tending to show a tacit admis-
sion on his part of the truth of the accusation, there being evidence
sufficient, *prima facie*, to support a conclusion on the part of the
trial court that defendant understood the meaning and bearing of
the accusation, that it was one that might under all the circumstances
naturally call for some action or reply on his part, and that the
occasion and circumstances were such as to afford him an oppor-
tunity for reply.  The weight of such evidence in that behalf is
solely for the jury.

ID.—EVIDENCE TENDING TO SHOW AN ADMISSION—QUESTION FOR TRIAL COURT.—Whether the circumstances are such as to make the failure to reply proper evidence tending to show an admission is, in the first instance, a question for the trial court.

ID.—DEFENDANT MAY EXPLAIN SILENCE—RECENT DENIAL OF SIMILAR ACCUSATION.—A defendant against whom evidence of a failure to deny an accusation has been introduced is entitled to show as a circumstance tending to explain his silence and rebut any possible prejudicial effect thereof, that he had within a few minutes previous thereto denied a similar accusation to the same police officers.

ID.—WEAPON USED IN KILLING.—A pistol sufficiently identified as the one with which the murder was committed is properly admitted in evidence.

APPEAL from a judgment of the Superior Court of the City and County of San Francisco and from an order refusing a new trial. William P. Lawlor, Judge.

The facts are stated in the opinion of the court.

Breen & Kelly, and Sullivan & Sullivan, and Theo. J. Roche, for Appellant.

U. S. Webb, Attorney-General, and J. Charles Jones, for Respondent.

ANGELLOTTI, J.—The defendant was charged by information filed February 12, 1907, with the crime of murder, committed November 15, 1906. His trial was concluded April 13, 1907, the jury rendering a verdict of guilty of murder of the first degree. A motion for new trial was made, and this was decided by the trial court on July 11, 1908, the motion being denied. On July 25, 1908, judgment of death was pronounced. A bill of exceptions was settled and approved by the trial judge in December, 1909, and the transcript on appeal was filed in this court on March 30, 1910. The appeal is from the judgment and from an order denying a new trial.

While it is claimed that the evidence given upon the trial was legally insufficient to warrant the verdict, a claim that we are satisfied is not well founded, the main contention of counsel for defendant is that a new trial should have been granted upon the ground of newly discovered evidence.

This claim is pressed with great ability and earnestness by counsel, who are apparently convinced of the innocence of the defendant. For a proper understanding of the questions presented in this connection, it is essential that some of the facts be stated.

On November 15, 1906, between 8:20 and 8:30 P. M. the saloon of John O'Connell, at the northeast corner of Sixth and Brannan streets, San Francisco, was entered almost simultaneously by two men, one through a door opening on Brannan Street, and the other through a door opening on Sixth Street. Each was masked by a handkerchief, which was blue with white dots, and each was armed with a revolver. The man who entered by the Brannan-Street door was put by the witnesses as being a man about five and a half feet in height, as weighing from 140 to 155 pounds, and as wearing a dark coat and a soft black hat. The Sixth-Street door man was considerably taller. There were several men in the saloon at the time, one of them being George O'Connell, the deceased, who had been a member of the police force. The masked men ordered all present to throw their hands up. The deceased drew his own revolver, and firing immediately ensued on the part of deceased and the two masked men, with the result that deceased and another man in the saloon, named Lynch, were killed, and still another was severely wounded. The whole affair occupied only a few seconds.

The two masked men at once left the saloon, the Sixth Street man getting no further than the southeast corner of Brannan and Sixth streets, his dead body being found there very shortly after. He was discovered to be one Frank Burke, a young man well known in the vicinity. The Brannan Street man ran south, along the easterly side of Sixth Street, between Brannan Street and Townsend Street, a hundred feet or so, and thence across the street, encountering in his flight a pile of tin, scrap iron, and debris, on which he either fell or stepped, to a point on the westerly side of Sixth Street near a five-foot alley between a small one-story wooden shack known as the Sullivan saloon, fronting on Sixth Street, and another small wooden shack occupied for saloon purposes by one Dillon. The Dillon saloon had then been closed for the night. The Sullivan saloon was still open, and Thomas

Sullivan, one of the brothers of Patrick Sullivan, the proprietor, and several men, were in the front room of the building, which was the bar room.

A pistol was a little later, between 10 and 11 p. m., found under the steps of a rear entrance to the Sullivan shack. It contained one empty chamber, two empty shells, and three loaded shells. A comparison of the bullet which had caused the death of O'Connell, with the bullets remaining in the pistol, showed that they were all of the same make and size, all being bullets of 44 caliber, Winchester rifle cartridges. There was evidence to the effect that the Brannan Street man fired two shots.

The Sullivan shack contained, in addition to the bar room, two little rooms which were used for lodging purposes by a number of men who were permitted by Sullivan to occupy the same. The lodgings thus afforded were of the crudest character, being simply two small rooms, upon the floors of which, with the aid of an old mattress or two and old bedwear, some nine or ten men were permitted to sleep. It was claimed that the lodgers were men whose work compelled them to be in that vicinity, and who, by reason of the conditions following the great fire of April 18, 1906, were under the necessity of occupying some such place.

The defendant, who had known the Sullivans for some time, had been one of these lodgers for about two weeks next preceding the murder of deceased. A little after 10 o'clock on the night of the murder, the Sullivan saloon building, which had then been closed for the night, was entered by police officers, Captain Duke being in charge. The defendant was found in one of the rooms together with five other men, all lying partially dressed, as was the custom, upon the mattress or rags upon the floor. The men other than defendant were Kelly, Canning, McGee, Morrissey, and a man named Rudolph, also known as Russell, all of whom were much larger than defendant, and who in no way tallied with the description of the Brannan Street man given by the witnesses of the attempted robbery and murder. In the other room were three men, Frank McDevitt, Gallagher, and Considine, none of whom resembled the defendant in appearance. In another room in front were Peter J. Sullivan and Thomas Sullivan, brothers of the proprietor, who were bar-

keepers in the saloon. After some investigation, the defend-
ant, Morrissey, and McGee, were taken by the officers to the
corner of Brannan and Sixth streets and put in a patrol
wagon. Defendant, on being told to dress, had put on a
dark coat, and a soft black hat which was declared by the
witnesses to the shooting to resemble the hat worn by the
Brannan Street man. There was nothing about defendant's
appearance to indicate that he had been engaged in an affray
of any kind. While these men were in the patrol wagon,
defendant was pointed out by a by-stander named Poole as
being a man seen by him with Burke the night before, and
he was taken from the wagon and searched. In one of his
pockets was found a blue handkerchief with white dots,
declared by the witnesses to be similar to the one worn as a
mask by the Brannan Street robber. According to the testi-
mony of the officers, one of the corners of this handkerchief
was twisted somewhat and another diagonally opposite
twisted a little, the idea conveyed by this testimony being
that the two ends had recently been knotted together. Captain
Duke called defendant's attention to this, saying, according
to defendant's own testimony, "That looks as if it had been
twisted," and the defendant's only response was to the effect
that the twisted appearance was caused by nasal discharges.
This explanation Captain Duke declared was untrue in point
of fact. The officers then took defendant back to Sullivan's,
and it was on this visit that the pistol was found.

The witnesses of the shooting agreed upon the proposition
that the defendant in size and build resembled the Brannan
Street robber in appearance. Defendant's weight, however,
did not actually exceed about one hundred and twenty
pounds.

The evidence warranted the conclusion that Burke, the
dead robber, was an habitué of the Sullivan saloon, was at
times one of the lodgers there, and was well known to all
the inmates thereof. While evidence of any special intimacy
between him and defendant prior to November 14, 1906,
is wanting, according to his own testimony defendant had
known him for six or seven weeks and had first seen him in
Sullivan's saloon. An officer testified that he had once seen
defendant in Burke's company on the street. Mrs. O'Connell,
wife of the proprietor of the Sixth and Brannan streets

saloon, lived over the saloon, and from a bay window the
night before the robbery, had observed two men apparently
skulking in the neighborhood. Being sufficiently apprehen-
sive as to the safety of her husband to send a message to him
telling him about two men hanging about whose actions in-
dicated to her an intent to hold up his place, she observed
them carefully. She was apparently quite positive that the
two men were Burke and the defendant. Poole, as to whom
we have already referred, said that the man he saw with
Burke the evening before the shooting, resembled the de-
fendant in size and build. He further said that such man
was not Hogan, whom he had worked with and knew very
well. Heffernan, a railroad man living at the Buffalo Hotel,
which was at the northwest corner of Brannan and Sixth
streets, was positive that he saw Burke and defendant to-
gether about 8 P. M. of November 15, 1906, about twenty
minutes before the shooting. He said that he saw them
approach the side entrance of that hotel and look in, and
then walk toward Brannan Street, coming within eight or
ten feet of him. He looked particularly at these men, think-
ing they might be persons he knew, and testified that he
could not be mistaken as to the defendant being the smaller
man of the two. The smaller man, he said, had on a dark
coat and a black soft hat. He subsequently heard the shoot-
ing and saw Burke come out of the Sixth Street door of the
saloon. He said he had never seen the defendant prior to
this occasion.

The evidence warranted the conclusion that defendant had
not been working at all since his discharge from the city
and county hospital early in October, or endeavoring to
obtain work. He was in the city and county hospital from
September 20th or 22d to October 11th, suffering, he said,
from lead poisoning. While much was made by the defense
of the fact that he was administrator of the estate of his
father, who lost his life by reason of the earthquake and fire
of April, 1906, it was apparent that his duties in this behalf
were not of such a nature as to occupy his time, and there
was no pretense that the estate was of such a character as
to supply him with any appreciable amount of money, or
that he had any expectation of realizing anything from the
estate. It was fairly inferable from the evidence that he was

without means of support, and at the same time without the
disposition to work.

The trial of defendant was commenced on March 18,
1907, and continued, without intermission, to and including
March 25, 1907. The defendant testified as a witness on the
last-named day, his examination being concluded, and the
district attorney reserving the right to recall him for further
cross-examination if desired. Owing to the sickness of two
of the jurors, the trial was not resumed until April 9, 1907.
Up to the time of this adjournment, defendant had con-
tented himself with stating simply that, during the whole
of the evenings and nights of November 14 and 15, 1906,
from as early as 6:30 until Sullivan's saloon was closed for
the night, he was in the bar room of that resort, leaving it
only to go to bed when the saloon closed. His evidence was
of such a nature as to preclude the idea that a man named
Hogan, who will hereafter be referred to, came to the saloon
at all that evening, and the record forbids the conclusion
that he had ever intimated to his counsel or any other person,
anything about Hogan, or the remarkable event portrayed
in his subsequent evidence, given when the trial was re-
sumed on April 9, 1907. That evidence was substantially
that about 8:30 of the evening of November 15th, a man
named Hogan, who did not live at the saloon, but who fre-
quently came there and was a friend of the Sullivans and
known to those frequenting the place, appeared at a door
leading from the saloon into the hallway, with a gunshot
wound on the right side of his jaw, at one end of which was
a bullet which one of those present knocked out of his jaw
with a finger, causing it to fall to the floor. Defendant picked
up the bullet, looked at it, and threw it out of the door. Hogan
said, "Frankie dropped" or "Frankie fell." Hogan at once left
the saloon in the company of Peter Sullivan and Joe Liddy.
It was made to appear on the motion for a new trial that
defendant made a similar statement to his counsel between
March 25th and April 9th, and, by arrangement of his
counsel, had submitted to an examination before the dis-
trict attorney, in which he told a substantially similar story.
His expressed reasons for having previously suppressed what
he claimed to be the truth in a matter most vital to himself
were his fear of Hogan and the other inmates of the place

who were friendly to Hogan, and his indisposition to involve another man. When during the intermission in his trial he found that Thomas Sullivan, the barkeeper on duty in the Sullivan saloon from 7 P. M. until the saloon closed, and upon whose testimony he relied to show his own continuous presence there, had disappeared, he concluded, so he said, to divulge these important facts.

This testimony having been given, much of the remainder of the trial was devoted to an investigation of the claim of Hogan's participation in the affair. No witness on the trial corroborated the remarkable story so told by defendant. Peter Sullivan, who was said by defendant to have left the saloon in company with Hogan, said that he went to his room at 7 o'clock on being relieved from duty as barkeeper, stayed there until the officers invaded the place, and heard nothing about the affair until then. Canning, one of those present in the saloon the whole of the evening after 7:10, testified for defendant to the effect that defendant was present during all of the time, but positively denied the alleged Hogan episode, and also denied that Joe Liddy was there at all. Liddy testified that he was not at the saloon at all that evening. These appear to be the only persons claimed to have been in the saloon during the whole of the evening of November 15th who were examined on the trial, although others present were accessible.

Hogan was a married man, living with his wife and child on San Jose Avenue at a point somewhat remote from Sullivan's saloon. He was a horseshoer by occupation, and had been working in San Francisco as such for a man named Krouse, almost continuously for about three and one-half years prior to November 15th. Krouse's place of business was 410 Brannan Street. Hogan resembled defendant somewhat in height and build, but was a little heavier and a little taller. It appears to be conceded also that he was a man of dark complexion, while defendant was light. As before stated, Hogan frequently visited Sullivan's and was well known there. He had known Burke for a long time, and was intimate enough with him to have gone, according to his own testimony, on a hunting trip of some days' duration with him, and another person, a few weeks before November 15th. At the time of the trial he had a scar on his jaw, the

result of a wound inflicted within at least a few weeks of November 15th. Hogan's testimony on the trial was to the effect that the wound was due, not to a bullet, but to a kick inflicted by another man some time before November 15th, and the evidence of Dr. Bacigalupi, based upon an examination of Hogan at the time of the trial, was strongly in support of the claim that the scar was not the result of a bullet wound. There was evidence on the trial to support Hogan's claim that he was at his home during the whole of the evening of November 15th, and none opposed thereto except the evidence of defendant hereinbefore referred to. The question of the possibility of Hogan's participation in the affair of November 15th was gone into at great length on the trial, his own examination on the part of learned counsel for defendant being most searching.

While a mere reading of the record in this case necessarily leaves one in grave doubt on the question of the defendant's guilt, there is certainly enough in the evidence to sustain the conclusion of the jury and trial judge who saw and heard the various witnesses, and who were in a much better position to determine the truth than a court that does not possess such an advantage.

An apparently very strong showing was made for a new trial on the ground of newly discovered evidence, but in the light of the well-settled rules applicable in the consideration of appeals from orders of trial courts denying such motions, we do not see how it can properly be held that the trial court abused its discretion in denying the motion.

The claim of newly discovered evidence warranting a new trial is universally looked upon by the courts with distrust and disfavor. Public policy demands that a litigant should be compelled to exhaust every reasonable effort to produce at his trial all existing evidence in his behalf. It has been said that the circumstance that the testimony has just been discovered when it is too late to introduce it is so suspicious that courts require the very strictest showing of diligence. (*People* v. *Freeman,* 92 Cal. 366, [28 Pac. 261].) It is recognized, however, that despite the exercise of such effort, cases will sometimes occur where, after trial, new evidence most material to the issue and which would probably have produced a different result, is discovered. For such cases, the remedy

CLX Cal.—15

of motion for a new trial on the ground of newly discovered evidence has been given. As declared by our Penal Code, the court may grant a new trial "when new evidence is discovered material to the defendant, and which he could not, with reasonable diligence have discovered and produced at the trial." It is well settled that a party who relies upon that ground must have made reasonable effort to produce all his evidence at the trial, and that he will not be allowed a new trial for the purpose of introducing evidence known to him and obtainable at the time of the trial, or which would have been known to him had he simply exercised reasonable effort to present his defense. (See *People* v. *Freeman,* 92 Cal. 359, [28 Pac. 261]; *People* v. *Rushing,* 130 Cal. 454, [80 Am. St. Rep. 141, 62 Pac. 742]; *People* v. *Sullivan,* 3 Cal. App. 513, 86 Pac. 834].)

In accord with these principles it has been held by this court that the testimony of a witness absent from the trial because his whereabouts were then unknown, the existence and materiality of which were known to defendant before the trial, was not newly discovered evidence on account of which a new trial could be granted, although defendant had endeavored to find the witness before the trial. The court said: "Knowing of the importance of his testimony, defendant should have moved for a continuance, and failing to do so, it must be held that it entered upon the trial at its peril." (*Germania Trust Co.* v. *San Francisco,* 128 Cal. 589, [61 Pac. 178].)

In *Berry* v. *Metzler,* 7 Cal. 418, it was said: "A party is bound to know the materiality of testimony known to him, except in cases of surprise at the trial. And when the party discovers new testimony before the trial, but too late to procure it, he should apply for a continuance."

When due diligence on the part of defendant to produce at the trial all evidence in his favor has been shown, the trial judge is still called upon, in the exercise of a wise discretion, to determine the weight to be given to the evidence produced upon the motion for a new trial, the truth of the matters shown thereby, and the materiality and probability of the effect of them if believed to be true. (*People* v. *Weber,* 149 Cal. 350, [86 Pac. 671].) That counter affidavits to rebut the showing made by defendant on such a motion, by discrediting the newly discovered witnesses, or by disputing the

alleged facts testified to by the new witnesses, may be presented on such a motion, was declared in *People* v. *Sing Yow*, 145 Cal. 1, [78 Pac. 235], where the court said that the law does not contemplate the granting of a new trial on this ground simply to enable the defendant to go through the form of another trial, "where there is no reasonable probability that the newly discovered evidence will change the result, and where it does not appear that by reason of such evidence the result ought to be different." In the case last cited, the duty and power of the trial court, in the determination of a motion on this ground, and the limited functions of an appellate court in reviewing the action of the trial court, were defined as follows: "The question as to the effect upon the case of the newly discovered evidence is from its nature peculiarly one that is addressed to the discretion of the trial court and, of course, should be determined by that court with a full realization of the responsibility involved, and the motion should undoubtedly be granted where the showing is such as to make it apparent to the trial court that the defendant has, without fault on his part, not had a fair trial on the merits, and that by reason of the newly discovered evidence the result would probably be, or should be, different on a retrial. But unless the appellate court can plainly see that this discretion has been abused, that the showing made was of such a character as to make it manifest that the case would or should result differently on a new trial, in view of the newly discovered evidence, the order of the trial court refusing a new trial will not be disturbed."

In the light of what has been said, the alleged newly discovered evidence to the effect that defendant was not absent from Sullivan's saloon at any time after 6:30 P. M. on November 15, 1906, and that Hogan appeared at Sullivan's just after the attempted robbery, wounded and apparently a fugitive, was not such as to warrant a reversal of the order of the trial court. The alleged newly discovered evidence in this regard was that of William A. Rudolph, Edward McKee, and John Morrissey, all lodgers in the Sullivan saloon, on the night of November 15, 1906, and Thomas Sullivan, barkeeper on duty therein on that night from 7 o'clock to the time when the saloon was closed. Rudolph, who at Sullivan's place went by the name of "Russell" or "Whitey," by affidavit, made May

28, 1907, in great detail corroborated defendant's evidence as to his presence in the saloon during the whole of the evening of November 15th, and the appearance of Hogan therein wounded. He further declared that prior to this, about 7:30 P. M., Burke and Hogan came into the saloon together, when Burke treated the house and he himself talked with Hogan, and that they left the place after a stay of about twenty minutes. He said that he heard pistol shots, and shortly after Hogan appeared bleeding profusely, declaring that "they got Frankie" and "me too." He declared, however, contrary to defendant's evidence, that he had seen no bullet. He said that he left San Francisco about December 4, 1906, and had failed to disclose the facts within his knowledge because afraid of Hogan and his friends. It was shown on the motion for a new trial that on or about August 11, 1907, Rudolph was killed at Redding, Shasta County, by falling under a moving railroad car while he was attempting to leave the same. The affidavit of Edward McKee corroborated defendant as to his being in Sullivan's saloon during the whole of the evenings of November 14th and 15th, and as to Hogan appearing shortly before the closing of the saloon, with a wound in the jaw bleeding profusely, declaring "They got Frankie," or "Frankie fell," and "They got me too," and corroborated Rudolph by declaring that Burke and Hogan came into the saloon together between 7 and 7:30 P. M., when Burke treated. He had been in San Francisco all of the time between November 15th and the close of the trial; had been kept in custody during a portion of the time in order that he might be available as a witness, and said that he had kept silent as to the Hogan episode because he knew that all parties in the saloon knew that Byrne was innocent, did not think it possible that he could be convicted, and did not desire to implicate Hogan. The affidavit of John Morrissey declared that defendant had been in the Sullivan saloon during the whole of the evenings of November 14th and 15th, but said nothing about the Hogan episode. Thomas Sullivan had been subpœnaed as a witness for the trial and had been in attendance up to the time of the intermission, but had disappeared during such intermission. He had declared to counsel for defendant that defendant was in Sullivan's saloon during the whole of the evening of November 15th. He does not appear to have been discovered up to the

time of the denial of the motion for a new trial. No request was made of the trial court during the trial for any continuance on account of his absence. This is also true of the witness Rudolph. McGee and Morrissey, though present at the trial, were not called as witnesses.

Of course, none of this evidence was really discovered after the trial. If defendant and Rudolph, McGee and Morrissey, were speaking truthfully in regard to the matter of defendant's presence in Sullivan's saloon, and the Hogan episode, defendant knew just as much about the existence of this material evidence before the trial, as he did after. Under ordinary circumstances, his failure to call Morrissey and McGee as witnesses and his failure to ask for a continuance for the purpose of procuring the presence of Rudolph would show such want of diligence in the matter of obtaining this testimony as would preclude consideration of it as newly discovered evidence. But it is earnestly urged that as defendant had learned that those present in the Sullivan saloon on the evening of November 15th would not testify to the Hogan episode, a fact shown in the case of Canning, who when called as a witness by him, denied that Hogan appeared there that evening, he was justified in refraining from calling them at the trial, and is now entitled to rely on their evidence as newly discovered evidence. If we assume this to be true, a matter we do not deem it necessary to decide here, and if we further assume that Rudolph's affidavit might properly have been taken into consideration by the trial court, notwithstanding his death and the consequent impossibility of introducing his evidence on a new trial, we still cannot say that there was an abuse of discretion on the part of the trial court in refusing to allow a new trial on account thereof.

The witness Morrissey, who still remained silent as to the Hogan episode, was discredited by evidence of inconsistent statements. On the night of the shooting, when examined in the Sullivan saloon by Captain Duke, in the presence of Sergeant Regan, he had said that he went to bed before 7 P. M., and knew nothing about the affair. On December 2, 1906, he had signed a statement to the same effect. On August 16, 1907, he said to Captain Duke, referring to defendant, "You've got the right man, and that's all there is to it," and later on the same day he said to Captain Duke, in the hearing of Ser-

geants O'Connell and Tobin and Officer McEntie, referring to defendant, "He did it, and that is all there is to it." The witness McGee had stated to Captain Duke on the night of November 15th, that he went to bed before 8 o'clock that night, that he did not know whether defendant went out of the saloon after he went to sleep, and that he knew nothing concerning the shooting of O'Connell. On December 2, 1906, he subscribed a written statement to the effect that he went to bed about 23 minutes to 8. On April 3, 1907, he stated in the presence of Captain Duke and Mr. O'Gara, that no one, to his knowledge, had come into the Sullivan saloon on the night of November 15th with any wound upon his jaw, chin, or face, and declared that he had not seen Hogan in said saloon at any time on the night of November 15th. On June 19, 1907, he stated to Mr. O'Gara, in the presence of Captain Duke, that Hogan was not in the saloon that night,. and that he did not know that any affidavit signed by him contained a statement to that effect, and it was shown beyond the possibility of controversy that he was fully informed of the contents of his affidavit before he signed it.

Rudolph had told Captain Duke in the presence of Sergeant Regan, when questioned on the night of the shooting, that he knew absolutely nothing of the shooting, and that he had been in bed and asleep from 7 :30 P. M. This statement found some support in the evidence given by Canning on the trial, wherein he testified that when he went to bed, Rudolph was already there, asleep. According to his own story he had subsequently left San Francisco, knowing that an innocent man was in custody charged with the murder of O'Connell, willfully concealing information that would at once establish his innocence, and enable the authorities to develop the facts establishing the guilt of the real perpetrator. In his affidavit, which was surprisingly specific as to every detail that could bear in favor of defendant, even to the hearing of the pistol shots in O'Connell's saloon, just prior to Hogan's appearance, he contradicted all the evidence in the case on the question of the handkerchief, saying that a blue handkerchief with white dots was taken from defendant in the saloon, while all the evidence showed that no handkerchief was found on defendant until after he had been removed from the saloon and taken to the corner of Sixth and Brannan streets. The trial

court may very reasonably have inferred that this statement was made to serve as a basis for his following statement that such handkerchiefs were in common use in San Francisco among laboring men. Shortly subsequent to the making of his affidavit, he stated to Mr. O'Gara, in the presence of defendant's attorney, that the man who came wounded into Sullivan's saloon was of fair or light complexion and about five feet four inches in height, whereas Hogan's complexion was dark and his height was at least five feet six inches. His expressed reason for his previous silence,—namely, fear of Hogan and his friends, might well be regarded by the court as false. There was nothing to indicate any real reason for such fear, and nothing to show why the reason, if good, did not still obtain.

In view of all the circumstances, it can only be said, as was substantially said in *People* v. *Weber,* 149 Cal. 350, [86 Pac. 671], that potent as these affidavits may have been, if believed, it may not be said by this court that the trial court did not exercise a sound discretion in absolutely discrediting them.

Another line of alleged newly discovered evidence relied on in support of the motion was evidence tending to show that Hogan and the other employees of Mr. Krouse had each been given some months before November 15, 1906, a blue bandanna handkerchief with white dots, and also evidence tending to impeach Hogan's evidence that he spent all of his evenings at home, by showing that on several occasions he had been out in the evening with one of his fellow employees. The mere fact that Hogan may have been the possessor of a blue handkerchief with white dots was of little significance. It does not appear to be questioned that such handkerchiefs were quite common in San Francisco at that time, and the important thing in regard to the handkerchief found on defendant was, not only that it appeared to the witnesses to be similar in color and design to that worn by the Brannan Street robber, but that it also appeared to the officers, when found upon defendant, to have been twisted at two ends, so as to indicate that such ends had recently been knotted together. The showing tending to impeach Hogan's evidence as to his habit of staying at home evenings was very slight, and altogether entitled to little if any weight in the determination of the motion by the trial court.

A more important matter, probably, was the showing tending to affect the evidence given by the witness Heffernan, the witness who positively identified defendant as being the man in company with Burke at the corner of Sixth and Brannan streets a few minutes before the shooting. This testimony of Heffernan was very important to the prosecution, as he was the witness who on the trial most positively identified defendant as being in the company of Burke on that night. So far as the new evidence tended to show Heffernan to be a man unworthy of credit, it need only be said that very little was thereby added to what had been shown on the trial, and the trial court was amply warranted in concluding that even that little was so explained by the counter affidavits as to make the showing of no importance.

The real question in regard to the Heffernan matter arises from the discovery by defendant's attorney of the fact that Heffernan saw Burke in the O'Connell saloon on the night of November 14th, about 10 o'clock, when Burke came in with another man, about five feet six inches in height, and of light complexion, and had a drink at the bar, and that he could not tell whether or not such other man was the defendant. Heffernan's affidavit to this effect was presented by defendant on the motion for a new trial. He had not been questioned about this when examined on the trial, the defendant having no reason to suspect that he had seen Burke on November 14th. The importance of this testimony lay in the fact that the two men so visiting the O'Connell saloon on the night of November 14th were the same men whom Poole testified to seeing at the Buffalo Hotel door that night, and thereafter in the O'Connell saloon, one of whom, he said, resembled the defendant in appearance, and were possibly the two men referred to in the testimony of Mrs. O'Connell, and also in the doubt that might reasonably arise concerning the identification by Heffernan on the night of the 15th, if he was unable to identify the same man on the night of November 14th. There were also presented the affidavits of counsel for defendant, to the effect that Heffernan had stated to them, first in July, 1907, and again in January, 1908, when questioned by them, that he had looked particularly at the features of the smaller man of the two in O'Connell's saloon, on November 14th, and that such smaller man was not the defendant, and that he in fact

resembled Hogan more than defendant, but that on the latter occasion he would not say whether he was Hogan "or looked like Hogan." No counter showing was made to rebut the statement made by counsel in these affidavits.

We have given the claims of learned counsel as to the showing in this behalf, our most earnest consideration, but cannot escape the conclusion that we are not warranted in disturbing the action of the trial court thereon. Heffernan, who was examined and cross-examined at great length on the trial, did not appear to have in any way changed his views as to the identity of the man whom he saw with Burke on the evening of November 15th, or to have made any statement inconsistent with his testimony in that regard given on the trial. That he should be able to identify the man he saw on November 15th just a few minutes before the shooting, while not able to say he was the same man he saw in the saloon the night before, is not at all incredible, and the judge of the trial court was better able than we are to determine as to the probable and proper effect of such an inability on his part. It is not at all clear that the man with Burke in O'Connell's saloon on November 14th, whom Poole and Heffernan saw, was the same man whom Mrs. O'Connell saw with Burke that evening. In fact, the testimony of Poole and Mrs. O'Connell rather indicates that they were speaking of different periods of time, Poole seeing his two men go to the Buffalo Hotel door after the place had closed for the night, and Mrs. O'Connell seeing her two men enter that place before it was closed. It may well be that the man in the O'Connell saloon on November 14th, who, according to Poole, was not Hogan, and resembled defendant, was not the defendant at all, and that Heffernan was correct in his evidence given on the trial to the effect that he had never seen defendant prior to the night of November 15th. Assuming, then, that it could be clearly shown that the man who was with Burke in O'Connell's saloon on November 14th, was not the defendant, and also was not Hogan, as is established by Poole's evidence, it cannot be doubted that the question of the probable and proper effect of such showing, as well as the question arising because of inconsistencies in statements made by Heffernan, were exclusively for the trial court.

This disposes of all substantial claims in regard to newly discovered evidence. Learned counsel say substantially that

if the showing here made is not sufficient to require a reversal, it is difficult to conceive of a case where such a showing can be made. This we are by no means prepared to concede. But it is undoubtedly true, in view of the settled law relative to the discretion of the trial judge in the disposition of motions based on this ground, that such cases will necessarily be rare. While allowing such motions, it is the settled rule in this state, based on the soundest reasons of expediency and public policy, that the decision thereon of the trial court, the tribunal best fitted to correctly determine as to the genuineness and effectiveness of the showing, shall be conclusive in the absence of a clear showing of abuse of discretion. The record in the case at bar shows that the trial judge allowed the defendant unusual opportunity for the making of his showing in support of his motion, and apparently gave most careful consideration to the same and to the argument of counsel in support thereof. The case is not such as to warrant us in holding that he was wrong in his conclusion.

Evidence of Captain Duke, Sergeant Regan, and Sergeant O'Connell, was admitted, to the effect that while defendant, McGee, and Morrissey, were in the patrol wagon at Sixth and Brannan streets, Poole told Captain Duke that he had the right man in the wagon, the one in the middle. According to Regan, Poole pointed at defendant while he spoke, and said, further, "I saw this man with Burke last night, trying Garry Welch's door." Duke also testified to the latter statement, all agreeing that defendant remained silent in the face of Poole's statement. Up to this time, defendant had not been formally arrested for this crime or searched, but had simply been taken in charge, with McGee and Morrissey, for further investigation. This evidence was received on the theory that defendant's silence in the face of the accusation was proper as tending to show a tacit admission on his part of the truth of the accusation. It has been uniformly held in this state that an accusation may naturally call for a reply even from a person under arrest. Whether the circumstances are such as to make the failure to reply proper evidence tending to show an admission, is, in the first instance, a question for the trial court. We are of the opinion that the evidence here was sufficient to support a conclusion on the part of the trial court that it, *prima facie,* showed that Poole's statement was made in the

presence and hearing of defendant, that defendant understood its meaning and bearing, that it was one that might under all the circumstances shown be held to naturally call for some action or reply on his part, and that the occasion and circumstances were such as to afford him an opportunity for reply. This being so, the evidence was admissible as tending to show an admission by defendant, (see *People* v. *Amaya,* 134 Cal. 531, 536, [66 Pac. 794]), the question of its weight in that behalf being purely for the jury. While the record does not indicate to us that defendant's silence under such circumstances would be considered of much importance, we cannot say that there was error in the admission of the evidence. It should be remarked in this connection that defendant, in his evidence, said that after he had been taken from the wagon, Poole said in his presence and hearing: "He looks like the man, looks like the fellow that was with Burke last night," or something to that effect, and that he replied to Poole, "Now, you make sure, and don't say it was me unless you are positive." The record indicates that defendant was speaking of the same occasion that was testified to by the officers, for it may well be concluded therefrom that Poole made only one statement in regard to the matter. According to his own testimony, then, he did hear what Poole said, apparently understood it, and deemed the situation such as to call for a reply.

We have no doubt that a defendant against whom evidence of a failure to deny an accusation has been introduced, is entitled to show as a circumstance tending to explain his silence and rebut any possible prejudicial effect thereof, that he had within a few minutes previous thereto denied a similar accusation to the police officers who had him in charge at the time of the making of the second accusation. That he had already so recently fully denied an accusation to such officers might be considered a circumstance tending to explain failure to deny the second accusation, made by another party. Both Sergeant Regan and Captain Duke were asked on cross-examination to detail any conversation had with defendant in the Sullivan saloon prior to first taking him to the corner of Brannan and Sixth streets, and objections of the district attorney on the ground that the proposed evidence was "incompetent, irrelevant and immaterial, and not cross-examination and calling for self-serving declarations" were sustained. No evidence

had been given by either of them on direct examination as to any conversation in Sullivan's saloon. It is claimed here that the object of counsel in asking these questions was to show a denial of participation in the attempted robbery and murder for the purpose of explaining defendant's silence in the face of the accusation made by Poole. It is doubtful if any such purpose was as clearly stated to the trial court as it should have been. Certainly there was no intimation in the lower court and there is no claim here that it was expected to show that anything had been said in the conversation in Sullivan's saloon in relation to the matter of defendant being with Burke the night before, which was really the whole effect of Poole's accusation, as testified to by both Duke and Regan. In effect, Poole had simply said that he had seen defendant with Burke the night before, and that consequently he must be the right man. The showing of a mere previous denial by defendant of participation in the attempted robbery and murder would not have tended to explain his silence in the face of the charge that he was with Burke the night before. It is therefore manifest that defendant could not have been prejudiced by a refusal to allow him to show a previous denial of participation in the attempted robbery and murder.

There was no error in admitting in evidence the pistol found under the steps leading to Sullivan's rear entrance. It had been sufficiently identified as the pistol that had been used by the Brannan Street robber and that had caused O'Connell's death.

We find no prejudicial error in the action of the trial court in striking out portions of the affidavits presented on motion for a new trial. There was no error in the rulings on cross-examination of Thomas Hogan and Catherine Hogan or in the action of the court in the matter of instructions.

We find no other matter requiring mention.

The judgment and order denying a new trial are affirmed.

Shaw, J., Sloss, J., Henshaw, J., Lorigan, J., and Melvin, J., concurred.

Rehearing denied.