[Crim. Nos. 6270, 6349. Second Dist., Div. One. Dec. 9, 1958.]

THE PEOPLE, Respondent, v. FREDERICK ARNOLD LOAR, Appellant.

[Two Cases.]

Daniel Paul Rikalo for Appellant.

Edmund G. Brown, Attorney General, William E. James and Arthur C. de Goede, Deputy Attorneys General, for Respondent.

WHITE, P. J.—We are here confronted with two appeals taken in one action, and which by stipulation have been consolidated for hearing and decision upon a single set of briefs.

In an information filed by the district attorney of Los Angeles County, defendant was charged in two counts with the crime of forcible rape (Pen. Code, § 261, subd. 3). In the first count the act was alleged to have been accomplished on or about October 31, 1957, with and upon Barbara Jean Wilson. The second count alleged the act was accomplished with and upon Geraldine Butterbaugh on or about December 9, 1957.

Defendant pleaded not guilty to both counts. He personally and all counsel waived trial by jury. By stipulation the cause was submitted on the testimony contained in the transcript of the proceedings had at the preliminary hearing with each side reserving the right to further introduce evidence and defendant reserving the right to cross-examine the witnesses for the People.

At the conclusion of the trial, the court found defendant guilty as charged on each of the two counts. His motion for a new trial was denied.

Under section 5504 of the Welfare and Institutions Code, the court appointed three doctors to examine the appellant as to being a sexual psychopath.

Although no judgment or probation order had been made or entered, defendant, as he was entitled to do, filed notice of appeal from the order denying his motion for a new trial (*Thurmond* v. *Superior Court*, 49 Cal.2d 17, 21 [314 P.2d 6]). The appeal in 2nd Criminal 6270 is prosecuted pursuant to the aforesaid notice.

Subsequently, defendant was found not to be a sexual psychopath. Proceedings were suspended and probation was granted for five years with the first year to be spent in the county jail. Appellant filed a notice of appeal from the "judgment of conviction" (Pen. Code, § 1237, subd. 1). The appeal in 2nd Criminal 6349 is prosecuted pursuant to the last mentioned notice.

As to the factual background surrounding this prosecution, the record reveals the following:

### Count I

Barbara Jean Wilson, a junior high school student, was home alone in her bathroom at about 9:30 on the night of October 31, 1957, when she noticed the lights "flickered on and off." She remained in the bathroom for about thirty minutes, when the back door opened and "the lights were off." Miss Wilson then went to the service porch and "yelled . . . Whoever is in the back yard get out and leave me alone" or "leave the house alone." Thereupon, ". . . this figure jumped in at me." The witness testified that the intruder was "six feet, or five foot-eleven, or something like that," that he was wearing "levis, and he had a leather jacket, dark-colored jacket, a motorcycle jacket . . . he had a white hood over his head." Shown a black leather jacket with a buckle on it, which was taken from defendant at the time of his arrest, the witness testified, "It looks like the type of jacket that the

person had on." The prosecutrix testified that the man "grabbed me by the throat and told me not to scream or he would kill me." The assailant then forced her into the living room where he commanded her to take off her clothing which she did. She then struggled with him but he overpowered her and forcibly accomplished an act of sexual intercourse upon the complainant notwithstanding her resistance. An automobile drove up in front of the house and the victim told her attacker her "parents were coming," whereupon he "ran off."

With regard to identification of the man who attacked her, the following occurred:

"Q. Now, during the time the person was in the house, he talked to you several times, is that true? A. Yes.

"Q. Did you go to a police lineup later on? A. Yes.

"Q. In the police lineup did they have a person in the lineup—the persons in the lineup talk? A. Yes.

"Q. Did you pick someone in the lineup as having a voice like this person who was in your home? A. I didn't personally pick him out, but after he was picked out, I recognized him.

"MR. SPENCER (attorney for defendant): I will object to that as not responsive.

"THE COURT: Objection sustained.

"Q. BY MR. SHEA (Deputy District Attorney): Did you recognize one of the voices as being the voice of this person which was in your house on that date? A. Yes, I did.

"Q. Did you get to see who that person was in the lineup? A. Yes, sir.

"Q. Is that person in the courtroom today? A. Yes.

"Q. Would you point him out? A. Sitting over there.

"Q. The man seated at the end of the table? A. Yes.

"THE COURT: The record will indicate that the witness has pointed to the defendant."

On cross-examination, the prosecutrix was interrogated as follows:

"Q. BY MR. SPENCER: Let's get down to this police lineup. How many persons did you see in the lineup? A. I believe there was five or six.

"Q. Outside of the man seated at my left, there was only one other man in that group who was his approximate height, in the group, wasn't there? A. I couldn't be sure of that.

"Q. Do you remember two or three persons in the group that were obviously shorter than the man you saw? A. Yes.

"Q. Now, when they had these different individuals speak, you couldn't identify the defendant's voice as the voice you heard at your home on this particular occasion, could you? A. Yes, it is.

"Q. It was only after someone else, either the police or some other person told you that the defendant was the man in the room that night, that you now say he was, isn't that true? A. Yes."

On recross-examination the following occurred:

"Q. At least someone other than the police identified the defendant, is that right? Before that time you did not identify him? A. Yes.

"Q. Although you were asked if you could recognize him? A. Yes."

On redirect examination, the following testimony was given:

"Q. Was the voice you heard of the defendant, was that the same voice you heard at your house? A. Yes.

"Q. No one told you that was the same voice, did they? A. After he had been identified and he said some of the sentences, to me it was the same voice, it sounded like the same voice.

"THE COURT: What do you mean identified?

"THE WITNESS: After the other person identified him as being the person in her house.

"Q. BY MR. SHEA: That was some other girl? A. Yes.

"Q. Your identification is not entirely by a voice but it is more by the voice, is that correct? A. Yes.

"Q. Although his body shape is similar to the person who was in your house, is that correct? A. Yes."

### COUNT II

Geraldine Butterbaugh was at home asleep about 2:30 a. m. on December 9, 1957. She was awakened by a loud crash of falling glass. As she started down the hallway she heard another crash. In answer to a question as to what she did, the prosecutrix stated, "I arose, I didn't try to turn on the light. My little boy called out and I went in to his bed and I saw that everything was all right there and I went back to my bedroom. I heard the second crash and I started down the hallway and was met by this hooded man with a flashlight. I screamed and he grabbed me around the throat. My back was against his chest. He tried to choke me. I realized he meant business. I didn't struggle and he said, 'I won't hurt you.'" Defendant forced her through the house and into

the spare bedroom where he said he was going to rape her. At the command of defendant, the victim removed her clothes and he did likewise. Defendant said to the witness, "If you make a noise I'll kill you." Defendant thereupon accomplished this act of sexual intercourse upon her. Mrs. Butterbaugh was employed as office manager at the Golden State Dairies, where defendant was also employed.

Regarding her identification of defendant, the prosecutrix testified that she uses the telephone very frequently in her work. That she went to police headquarters where she was confronted by defendant after his arrest. That she listened to defendant's voice on two occasions. At the trial, the following occurred:

"Q. Did you recognize one of these persons' voices as that of the person who was in the room with you? A. Yes, I did."

The witness then identified defendant as the man she saw at the police station.

"Q. By Mr. Shea: Now, at the time the man was in your house did you pay particular attention to his voice? A. I certainly did.

"Q. Why did you do that? A. I felt that all I could identify was the voice.

"Q. You could not see him in the dark? A. I could not see him.

"Q. You say you work on the telephone? A. Yes, I do.

"Q. And it is very essential that you know voices? A. It certainly is.

"Q. Do you make a study of voices? A. I do.

"Q. Did the person in the room make any statements to you as to the possibility of becoming pregnant? A. Yes, he told me he could not hurt me——

"Mr. Spencer: I object to that as immaterial.

"The Court: Objection overruled.

"The Witness: Shall I answer?

"Mr. Shea: Yes.

"The Witness: He told me, 'I can't hurt you, I am sterile.' "

On cross-examination the following transpired:

"Q. (By Mr. Spencer, attorney for defendant): You are basing this identification solely on the voice, is that right? A. Yes, sir."

Defendant was arrested about 3:30 on the morning of December 22, 1957, when he was observed crossing a street

wearing a hood over his head. In his possession was found a flashlight and a diaper.

Sworn as a witness in his own behalf, defendant testified that at his work, because of refrigeration, he wears a hooded sweater. With reference to the night of October 31, 1957 (Count I) defendant testified he was at home that evening; that at approximately 10 p. m. he left his home and went to work where he remained until 7 the following morning. With regard to the night of December 9, 1957 (Count II) defendant testified he did not work but remained at home. He remembered the night in question because his son was afflicted with the measles. That his mother-in-law was at his home that night. With reference to his arrest, defendant testified that he was ill that day, but because of pressing financial obligations he decided rather than absent himself from work, he would "go up early and get my work done, and then Fritz would let me get off early." That he went to work about 9 p. m. and left his employment about 3 a. m. That he was dressed "the way I usually dress." He was on his way to a drug store, "to pick up a newspaper." Defendant admitted he had a flashlight when apprehended which he had secured at the plant where he works because "my mother-in-law had asked me to check some batteries and I was taking it home to check these batteries." Defendant explained his possession of the gloves by stating he uses them in his work when handling dry ice. As to the diaper found in his possession, defendant explained that, "It was in my pant leg when I left for work"; that it was used at home for his baby son. That after discovering it he placed the diaper in his pocket. In explanation of his failure to have any means of identification upon him when arrested, defendant testified, ". . . I never carry identification sir, when going to work there on account of the box freezes and the dampness gets into and runs your ID cards." Defendant denied either of the offenses charged against him.

Defendant's wife testified that he did not leave home for work on the night of October 31, 1957 (Count I) until approximately 10 p. m.; that she recalled the night because it was Halloween. (The victim in Count I was assaulted about 10 p. m. on that night.) The testimony of Mrs. Loar was corroborated by that of her mother, Maria Aloisio.

Ronnie David Gardner, an 11-year-old boy who was acquainted with defendant and his wife, testified that on October 31, 1957 (Halloween night) he called at the Loar home shortly

after 8 p. m. and that defendant, his wife, and the latter's mother were all there.

There was testimony by Reinhold Lauster and Carl Vreeken, Jr., fellow employees of defendant at Golden State Dairies, that a "lot of men" wear hoods during their work at the dairy plant.

We shall first give consideration to appellant's contention that the court erred and abused its discretion in denying his motion for a new trial on the ground of insufficiency of the evidence to sustain his conviction.

On appeal from such an order, the appellate tribunal, in reviewing sufficiency of the evidence, will determine only whether on the face of the evidence insufficient facts are shown to warrant the implied findings of the trial court (*People* v. *Jones,* 36 Cal.2d 373, 375 [224 P.2d 353]). As was said in *People* v. *Newland,* 15 Cal.2d 678, 681 [104 P.2d 778] : ". . . it must be made clearly to appear that upon no hypothesis whatever is there sufficient substantial evidence to support the conclusion reached in the court below." Applying this rule to the case now engaging our attention, appellant's claim as to the insufficiency of the evidence cannot be sustained. Appellant earnestly insists that while the evidence may point the finger of suspicion at him, and might even indicate he had an opportunity to commit the offenses charged against him, it lacks that substantiality required to prove him guilty beyond a reasonable doubt. With this we cannot agree. As to Count I the victim identified appellant as her assailant at a police lineup. While it is true she was not sure the first time she heard his voice, she did recognize appellant's voice at a subsequent time. That Miss Wilson had ample opportunity to study the voice of her attacker is evidenced by the fact that he talked to her several times. She also testified that the "body shape" of appellant was similar to that of her assailant. True, it was impossible for the prosecutrix to identify the man who assaulted her by his face, since the lights were off during the time they were together, but as was said in *People* v. *Coley,* 61 Cal.App.2d 810, 814 [143 P.2d 755], quoting from *People* v. *Wilson,* 76 Cal.App. 688, 700 [245 P. 781], " 'It is not necessary that any of the witnesses called to identify the accused should have seen his face. "Identification," says the court in *State* v. *Mason,* 152 Minn. 306 [189 N.W. 452], "may be sufficient though the person making it cannot remember the face. Identification based upon other peculiarities may be reasonably sure." There the

Minnesota Supreme Court held that the identification may be sufficient though the witnesses say that they could not identify the accused from his face, the crime having been committed in the dark, but that they can identify him from his size, his general appearance, his talk, and his walk.'

"See, also *People* v. *Glab,* 15 Cal.App.2d 120 [59 P.2d 195] ; *People* v. *Bealey,* 81 Cal.App. 648 [254 P. 628]."

■ And in *Connell* v. *Clark,* 88 Cal.App.2d 941, 947 [200 P.2d 26], we find the following: "It is universally recognized that the voice, as well as the physical appearance of a person, is a means by which identification is made possible, there being no more similarity in the voices of different people than there is in their physical appearance. . . . Therefore, testimony relating to the identity of the voice is competent, its probative value being a question of fact for the jury." ■ It is well established in our law that the jury, or in this case the trial judge, is the sole judge of the facts and of the weight to be given to testimony, and though an appellate court may feel that the identification evidence is not too strong, yet it cannot interfere with or invade the province of the duly constituted arbiter of the facts, where the evidence is legally sufficient. Furthermore, there are other facts and circumstances shown in evidence tending to strengthen the identification of appellant as the man who assaulted the victims named in both counts of the information. The man who attacked Miss Wilson (Count I) wore a dark leather motorcycle-type jacket with a buckle and ornamental pieces of metal. A jacket owned by appellant was similar to this jacket and had a similar finish. Miss Wilson's assailant wore pants with a zipper, which were possibly levis. Appellant owns a pair of blue denims which have a zipper. Miss Wilson's assailant had a hood over his head. Appellant owns a sweat shirt with a hood and was wearing it when he was arrested.

When appellant broke into the Butterbaugh (Count II) and Molinar residences he wore a hood. (As to the Molinar residence, it might here be noted that at the preliminary examination, in addition to the two counts of the information, with which we are here concerned, appellant was also charged with attempted rape allegedly committed against one Catherine D. Molinar on October 14, 1957, but this count of the complaint was dismissed at the preliminary examination. However, her testimony is contained in the transcript of such examination and was used at the trial and on the motion for a new trial on the issue of identification of appellant.) Miss Wilson's

assailant wore gloves. Appellant had a pair of gloves in his pocket when arrested and the man who attacked Mrs. Butterbaugh (Count II) wore gloves. Before Miss Wilson (Count I) was attacked, and while she was still alone in the house, the electric lights flickered on and off. Before breaking into the Molinar and Butterbaugh residences, the intruder had turned the lights off. Miss Wilson's assailant grabbed her by the throat, threatening to kill her if she made an outcry. The same procedure was utilized when the assault was made upon Mrs. Butterbaugh.

Appellant contends that Miss Wilson (Count I) was assaulted shortly after 9 p. m. on October 31, 1957, and that the evidence shows that he was at home between 8 p. m. and 10 p. m. on that night. However, as pointed out by respondent, "Of course, it was not incumbent on the trial court to believe the testimony on appellant's time of departure for work. However, even if it was accepted, appellant still had opportunity to make the alleged attack, for Miss Wilson's testimony indicates that her assailant entered the house about 10 p. m. Her lights flickered on and off at about 9:30 p. m. She stayed in the bathroom for about thirty minutes then went to the back porch on hearing the back door open. Her assailant jumped in at her, and was in the house ten to fifteen minutes. Her assailant left about two or three minutes after attacking her."

As to Count II, the victim Geraldine Butterbaugh identified appellant as her assailant at a police lineup by recognizing his voice. Mrs. Butterbaugh works on the telephone and studies voices because it is essential that she know them. She paid particular attention to her assailant's voice because she could not see him and felt that was the only way she could identify him. She never did get to see his face but had plenty of opportunity to hear his voice. Assailant was in the house about 40 minutes.

The assailant took off all his clothes except his shoes before he attacked Mrs. Butterbaugh—some of his clothes were of the type that would come off and go on over the head. The sweat shirt in evidence which appellant owned is of this pullover type. Mrs. Butterbaugh's assailant had a flashlight. Appellant had a flashlight when he was arrested. The reason appellant gave for having the flashlight, which he did not own, was that, at his mother-in-law's request, he wanted to test some batteries which she had at home, even though there was no flashlight at home for which the batteries might be used.

There is testimony of the defendant, his wife and his mother-in-law that he was home on the night of December 9, 1957. However, as pointed out in respondent's brief, "Since Mrs. Butterbaugh was criminally attacked on the morning of December 9, at 2:30 a. m., this testimony does not establish an alibi. Even assuming that the testimony was meant to refer to the night of December 8, the court did not have to accept it. The mother-in-law's testimony clearly indicates that she felt appellant always went to work about 10 p. m.— she testified appellant went to work about 10 p. m. on a day on which appellant did not have to go to work at all.

"When arrested at about 3 a. m. on December 22, 1957, appellant was walking in a direction away from his home. He had no identification. He was away from his work during his regular working hours."

The trial court was not compelled to accept appellant's explanation of his unusual conduct in wearing the hood over his head when arrested nor of his possession of the diaper, flashlight and gloves. ██ When a person suspected of and charged with crime resorts to deception and falsehood, that is a circumstance which, like flight and concealment, tends to show a consciousness of guilt, and thereby strengthen any inference of guilt arising from other established facts. All of the attacks occurred within walking distance of appellant's home, and when apprehended he carried no driver's license or other means of identification.

██ We are satisfied that appellant's contention that the evidence and the reasonable inferences to be drawn therefrom are insufficient to justify the trial court's finding of guilt, is not supported by the record or the law and therefore, the court below did not abuse its discretion in denying appellant's motion for a new trial on the ground of insufficiency of the evidence.

██ It is next urged by appellant that the court erred and further abused its discretion in denying him a new trial on the ground of newly discovered evidence. With commendable candor, appellant's counsel concedes that newly discovered evidence to warrant a new trial must be such as would render a different result reasonably probable on a new trial (*People* v. *Radz,* 119 Cal.App. 435, 437 [6 P.2d 527]); that the evidence must be such as could not, with reasonable diligence, have been discovered and produced at the trial; that such a motion is addressed to the sound discretion of the trial court, and its action will not be disturbed except

for a clear abuse of discretion (*People* v. *McGarry*, 42 Cal.2d 429, 432 [267 P.2d 254]). To the foregoing should be added that a showing must be made by appellant that the evidence, and not merely its materiality, be newly discovered; that the evidence be not cumulative only, and that all the aforesaid facts be shown by the best evidence of which the case admits (*People* v. *McGarry, supra,* p. 433).

It is now well established that the claim of newly discovered evidence is universally looked upon with distrust and disfavor (*People* v. *Greenwood*, 47 Cal.2d 819, 821 [306 P.2d 427]). The reason for this rule is thus stated in *People* v. *Byrne*, 160 Cal. 217, 225 [116 P. 521]: "Public policy demands that a litigant should be compelled to exhaust every reasonable effort to produce at his trial all existing evidence in his behalf. It has been said that the circumstance that the testimony has just been discovered when it is too late to introduce it is so suspicious that courts require the very strictest showing of diligence. (*People* v. *Freeman*, 92 Cal. [359] 366 [28 P. 261].) It is recognized, however, that despite the exercise of such effort, cases will sometimes occur where, after trial, new evidence most material to the issue and which would probably have produced a different result, is discovered. For such cases, the remedy of motion for a new trial on the ground of newly discovered evidence has been given."

In the light of the foregoing rules it cannot be said that the trial court abused its discretion in the case here under consideration.

In support of his motion for a new trial, appellant filed several affidavits. One was that of Barbara Gene Wilson, the victim in Count I of the information, in which she stated:

"With regard to identifying the suspect, my father took me to the police station on a Sunday. I don't remember the date. The police had 5 or 6 men in the lineup and we were in a room, the Molinar girl, her mother and I. Out of the five or six men three of them were too small and skinny. Two of them were large, one was real tall. All of the men talked but I was able to discount the words of the ones that didn't look like the man. After they all spoke, the police asked me to identify the one that committed the act and I told them that I couldn't. The Molinar girl's mother said that that could be him and she pointed or indicated Fred Loar. Her daughter agreed with this I.D. and they had the men

talk again and I told the police that the man that Mrs. Molinar pointed out could be him. I did not make a positive identification. Only at one time during the lineup did the fellow that I said could be the one, sound like it may be the same voice; and only one time in court his voice sounded like it could be the same. The rest of the time it didn't.'' The substance of the foregoing is that Miss Wilson only identified appellant as her assailant after someone else (the mother of Catherine D. Molinar) had identified him as the person who had broken into the identifier's home on another occasion. This was also the substance of the affidavit of Miss Wilson's father, who also stated: ''I saw the men in the lineup and there were no other men there with the same physical description as Fred Loar (appellant).'' However, the facts stated in these affidavits were known to appellant at the preliminary examination, as is indicated by the transcript of that proceeding which was submitted to the trial court, and quotations from which we have herein narrated in summarizing the factual background surrounding this prosecution.

In another affidavit by Paul F. Eddy, a private investigator, the deponent states: ''That in the course of his investigation he learned that one WILLIAM ESTERLINE, of 19136 Kittridge Street, Reseda, California, telephone number DIckens 2-5280, had approached the Defendant on February 8, 1958, the day before Defendant's hearing in Department 14 of the Superior Court of the County of Los Angeles in re the instant matter, and asked the Defendant if he, the Defendant, had found or seen his, Esterline's hooded sweater which Esterline stated he had lost some five months previously; that the Defendant responded that he had not seen or found such hooded sweater;''. This can hardly be classed as newly discovered evidence since the affidavit itself shows that the day before appellant's trial, Mr. Esterline inquired of the appellant whether the latter had found or seen the sweater which Esterline had lost some five months previously. There remains the further fact that appellant had subpoenaed Mr. Esterline as a witness which would seem to indicate that any evidence the latter might be able to give was known to appellant at the time of trial.

There is some evidence contained in the affidavits which might be characterized as newly discovered evidence since it was unknown to appellant at the time of trial, nevertheless, the court did not abuse its discretion in denying a new trial, if such evidence would have been known to appellant had he

made a reasonable effort to procure it before and at the trial (*People* v. *Byrne, supra,* p. 226).

As noted in respondent's brief, "The statements allegedly made by Mrs. Butterbaugh (victim in Count II), as related in the affidavits of (private investigator) Paul F. Eddy could all have been ascertained before the trial—at least there is no showing that Butterbaugh was unavailable. Appellant contends that he used reasonable diligence to uncover said evidence in that Butterbaugh was cross-examined at the preliminary hearing and did not reveal at that time that she had already been informed by the police whom she would be asked to identify and that she was of the opinion that appellant was a 'liar' and had a 'bad reputation.' ▮▮ But newly discovered evidence of the prosecuting witness which is so closely related to evidence given by said witness that it might have been obtained on a cross-examination is not ground for a new trial. (*People* v. *Phelan,* 123 Cal. 551, 568 [56 P. 424].)

▮▮ "In the present case, circumstances of identification is certainly closely related to identification. It would also seem that the time to show bias of the prosecution witness (Butterbaugh allegedly was of the opinion that appellant was a 'liar' and had a 'bad reputation') would be on cross-examination and not after the appellant was found guilty. It should be noted that appellant had the opportunity to cross-examine Mrs. Butterbaugh (and Miss Wilson) twice—once at the preliminary hearing and once at the trial—and that appellant waived his right to cross-examine at the latter time as to all the prosecution witnesses."

The purported newly discovered evidence in the affidavit of Rosanne Okin with regard to a man who followed her and Miss Wilson (victim in Count I) on the night of the assault upon the latter, as they were on their way home from a Halloween party and that this man was not the appellant, would not in our opinion be such as to render a different result reasonably probable on a new trial, and there is no showing that deponent was unavailable to appellant before the trial.

As to the foregoing affidavit of William Esterline, it should be noted that at the trial it was stipulated that if the witness was called and sworn at the trial, he would testify to the disappearance of his "hooded shirt," as set forth in Mr. Esterline's affidavit, and such evidence was stricken on the ground

it was immaterial. We are impressed that the trial court was justified in concluding that had due diligence been used, the evidence set forth in the supporting affidavits could have been produced at the trial.

We are further satisfied that appellant has not met the burden imposed upon him to show that the newly discovered evidence submitted by him on his motion for a new trial is such as to render a different result reasonably probable on a new trial. The affidavits indicate that Mrs. Butterbaugh (the victim in Count II), was advised by the police that the subject under arrest, and who she was requested to identify, worked at the dairy where she was employed. That, ''When I went down the list I knew he, Frederick Loar, was built trim. I eliminated the short, tall and old ones and I decided that he, Fred Loar, must be the one.'' That when asked by deponent Eddy, ''You told us a few moments ago that you didn't know Loar (appellant). Just how were you able to pick his name out from all of the rest?'' Mrs. Butterbaugh answered, ''I knew he was a liar and I know what his reputation is around here.'' Such evidence might tend to impeach Mrs. Butterbaugh's unequivocal identification of appellant at the trial as her assailant, as would her opinion of appellant as being a liar and having a bad reputation in that it would tend to show bias, but in the light of the many other incriminating facts and circumstances heretofore adverted to, as well as the positive identification of appellant by Miss Wilson (the victim in Count I), we are unable to say that the foregoing evidence would render a different result reasonably probable on a retrial.

What we have just said is also applicable to the affidavit of Rosanne Okin which rejects appellant at the attacker of Miss Wilson (Count I). Miss Okin was the person heretofore referred to who was in the company of Miss Wilson (Count I) just prior to the attack upon the latter and who states that a man followed them who resembled appellant and was attired in a manner similar to that of the assailant of Miss Wilson. In her affidavit, Miss Okin states that after viewing appellant she is of the opinion he was not the man who followed them. Miss Okin bases her statement on the fact that the man she observed following her and Miss Wilson wore lighter clothing and had lighter hair than that of appellant, and that he had a more rounded nose. While this testimony cannot be characterized as inherently improbable, it must be remembered that Miss Okin made her observation at night

at a cross-intersection with only an overhead street light to aid her. Miss Okin states that her view was a profile view but the person she observed was watching her as she approached the intersection where she made her observation. This evidence that there was some person other than the appellant in the vicinity of the Wilson home about an hour before Miss Wilson was attacked is clearly not of the type which would indicate a different result on a new trial.

We are also here confronted with the omission on the part of appellant to file an affidavit showing that he did not know of the existence of the evidence at the time of trial, that he used due diligence to discover the same, or that it could not have been discovered by the use of due diligence (*People* v. *Farber*, 19 Cal.App.2d 189, 192 [64 P.2d 1138]). No explanation is given of the reason why the newly proffered evidence could not be discovered during the time that elapsed between the preliminary examination and the trial. Considering the disfavor and suspicion with which this ground of the motion is regarded, we think the affidavits as to diligence should have been more explicit than they were.

Furthermore, much of the evidence submitted would be inadmissible as evidence in behalf of appellant even were a new trial granted him. Considerable of the contents of Paul F. Eddy's affidavits consisted of hearsay evidence.

While a mere reading of the record in this case might well leave one in grave doubt on the question of appellant's guilt, there is certainly enough in the evidence to sustain the conclusion of the trial judge.

An earnest and apparently rather strong showing was made for a new trial on the ground of newly discovered evidence, but in the light of the well settled rules applicable in the consideration of appeals from orders of trial courts denying such motions, we do not see how it can properly be held that the trial court abused its discretion in denying the motion in the instant case.

For the foregoing reasons, the judgment (order granting probation) (2d Crim. 6349), and the order denying defendant's motion for a new trial (2d Crim. 6270), are, and each is affirmed.

Fourt, J., and Lillie, J., concurred.