State vs. Albert et al.

No. 12,795.

STATE OF LOUISIANA VS. PAUL ALBERT ET AL.

A confession obtained by a deputy sheriff, under duress, is altogether inadmissible as evidence against an accused person.

APPEAL from the Eleventh Judicial District Court for the Parish of St. Landry.   *Dupré, J.*

*M. J. Cunningham*, Attorney General, and *R. Lee Garland*, District Attorney (*P. A. Simmons, Jr.*, of Counsel), for Plaintiff, Appellee.

*E. P. Veazie* and *C. F. Garland* for Defendants, Appellants.

Submitted on briefs April 23, 1898.

Opinion handed down May 2, 1898.

The opinion of the court was delivered by

WATKINS, J.   The two defendants, Paul Albert and Buddy Silvestor, having been convicted of burglary and sentenced to five years' imprisonment at hard labor in the State penitentiary, prosecute this appeal, relying on several bills of exception.

The first bill which was reserved by the accused relates to the ruling of the trial judge in admitting proof of a confession, whereas their contention is that said alleged confession was not a voluntary one, but obtained by means of threats and coercion on the part of officers of the law.

In the course of the reasons which he assigned for admitting the testimony relative to the alleged confession the trial judge said:

" Because in the court's opinion a confession was made, and it was a fair and voluntary one.  Mark well, defendants denied having made any confession at all.   The officers, on the contrary, prove that a confession was made, and that the same was fairly and voluntarily given, and the court accepts as true their testimony and rejects as unworthy of belief the testimony of the accused parties.  It is too monstrous for evidence.   Too gross for credulity itself."

The testimony is of following tenor:

31

Paul Albert stated that, at the time of his arrest, the officer, Millspough, accused him of having broken into the store of Mr. Herbert during the night previous, but that he denied the charge. That the officer insisted that he did break open the store, and told him that if he did not tell him the truth about it he would hang him at the jail; that there was a scaffold already made for him if he did not tell him about breaking open the store.

That, subsequent to his incarceration in jail, the officers took him out and carried him back to Port Barry, and carried him down in the woods, where they told him " they would kill him if he did not tell them about more people who went in the store." That they told him that if he would say he was there they would turn him loose.

He said the two officers were Mr. Millspough and Mr. Andrus. That they told him if he did not confess they would go to the jail at night and take him out and hang him. He said that the sheriff was present with them in the woods, and *protested against their conduct.*

But he emphatically denied having made any confession whatever to them. He said that he had another talk with those parties whilst he was in jail, in the presence of the sheriff and another party; and that in the course of their conversation, Millspough and Andrus showed him the scaffold and told him that they were going to hang him on it. He said that he was very much frightened.

It was admitted by the prosecuting attorney "that the scaffold alluded to in the testimony above written *is still standing in the jail yard, and was there at the time (the) above took place.*"

Buddy Sylvester states that after his arrest he was kept locked up in a cell, and when his trial came on Mr. Millspough told him just before he carried him down to the jailer's room, " Don't let those lawyers fool you, but (go) up there and plead guilty." That he told him to go into court and plead guilty, because if he did not " they would send him up the road or hang him, as Paul Albert had already confessed."

That on that day they brought him and Paul Albert into the sheriff's office and wrote their statements down; and that he was very much frightened at the time. That he, at all times, denied having broken into the store; that they pointed out to him the scaffold, also.

The purport of Millspough's testimony is to the effect that he did not threaten the accused with violence in order to obtain their

alleged confessions; but he admits calling them into the jailer's room for the purpose of taking their confessions in the presence of other persons, and that the sheriff continued therein during the time he was interrogating the prisoners *so as to put him on his guard.*

The following interrogation and answers then ensued, viz.:

" Q. You say that Mr. Andrus had cautioned you not to obtain any confession from those parties on the promise of reward, or immunity or threats?

" A. Yes, sir.

" Q. When where those cautions made to you?

" A. When we were talking to the prisoners.

" Q. The day that you obtained confessions from them in the jailer's room?

" A. I don't think the sheriff was there at that time.

" Q. Did he caution you on the occasion that you took the written confession?

" A. Yes, sir.

" Q. When was it that he was cautioning you?

" A. When we were questioning the prisoners to tell us.

" Q. Wherefore that caution?

" A. Being an old deputy he thought we might forget about this, and so put me and Mr. Dosholite on our guard for that reason.

" Q. Had you said anything to excite his fears on that occasion?

" A. No, sir; he was an old hand at the business.

\*          \*          \*          \*          \*          \*          \*

" Q. Is it not a matter of fact, Mr. Millspough, that you and those who assisted you would go to one of those parties and tell him that the other had confessed, when such was not the fact?

" A. I can not answer as to other deputy sheriffs, *but it was not my practice.*"

Again:

" Q. How many conversations had you with these parties in jail during the time they were locked up, separately?

" A. Maybe three, four or five.

" Q. Before they made their written statement?

" A. No; including the written statement, etc."

Again:

" Q. Did you not say, that with a view of extorting a confession from Paul Albert, you had tightened the handcuffs on his wrist?

" A. I said I had put them on pretty tight.

" Q. What was the purpose of putting them on tight?

" A. I ·thought maybe if I put handcuffs on him a little tight he would tell me the truth.

" Q. It was to make him·tell you something about the case, was it not?

" A. Yes; to make him tell the truth."

In the course of the interrogation of Andrus the following occurred, viz. :

" Q. You heard the testimony of Paul Albert about the Poplar Grove Woods and about pointing out the scaffold, is there any truth about that?

" A. I don't think that there was a word spoken to Albert *between here and Port Barry* by either Sheriff Dosholite, Millspough, or myself, etc."

There is more evidence of the same character as the foregoing, which we deem unnecessary to detail, and we must say that the whole of it, taken in connection with the declarations of the two defendants, has given us an impression quite different from that it gave the trial judge.

We are impressed with the idea that these several officers of the law—the sheriff and his deputies—were diligently and continuously engaged in the effort to obtain from the accused, by duress or surprise, some incriminating admission which would render their conviction sure; notwithstanding, it may be conceded that the threats of violence were figments of their imaginations, begotten, in great part, of fear.

Their arrest, and being heavily handcuffed and incarcerated in separate cells of the jail, where they were repeatedly interrogated and plied by their keepers with numerous questions, separate and apart from each other, with direct reference to the charges preferred against them, coupled with the injunction that it were better for them that they should tell the truth, is clearly indicative of an undue influence having been brought to bear upon them, for the purpose of eliciting proofs of their guilt. And it is a fact admitted by one of the deputy sheriffs, that one of the defendants was taken from the jail and carried some distance to the place of the supposed burglary, for the express purpose of confronting him with persons and facts which would serve to defeat his defence, same being an *alibi.*

The whole course of proceeding, as it is developed in the testimony, was altogether irregular, to phrase it as mildly as the circumstances will allow; and contrary to the usual course of justice. For the purpose of ferreting out crime the law provides a grand jury with inquisitorial power; and for the purpose of bringing criminals to justice, it provides a district attorney whose duty it is to find the witnesses and produce the proof of guilt at the trial. But the law never contemplated that the sheriff should usurp the function of either, much less to obtain incriminating statements from persons in his custody, by the process of " setting traps for the unwary," or by persuasion, duress, or the *power* of his office.

Testimony thus obtained ought not to be admitted in evidence against an accused; and the admission of the alleged confessions, under the circumstances related, is and was reversible error, and the verdict and sentence must be reversed and set aside.

It is therefore ordered and decreed that the verdict of the jury and thes entence thereon based be annulled and reversed; and it is further ordered and decreed that the cause be remanded to the court below for trial according to law.