[Crim. No. 3046. Second Appellate District, Division One.—March 17, 1938.]

THE PEOPLE, Respondent, v. LESLIE E. SHELLENBERGER, Appellant.

Selma K. Ellner for Appellant.

U. S. Webb, Attorney-General, and Alberta Belford, Deputy Attorney-General, for Respondent.

WHITE, J.—The defendant was convicted of a violation of section 3 of the Alcoholic Beverage Control Act (Stats. 1937, chap. 758), which denounces as a felony the ownership or possession of a still used in the production, or capable of being used in the production, of alcoholic beverages, without first having obtained a still license from the State Board of Equalization. From the judgment and sentence this appeal is prosecuted.

As the first ground for reversal, it is urged that the evidence is insufficient to support the verdict, in that the prosecution failed to meet the burden resting upon it to prove that the paraphernalia found upon the premises of appellant was "capable of being used as a still" within the meaning and contemplation of the statute.

There was presented to the jury evidence showing that on the afternoon of July 30, 1937, three officers of the liquor control board found on the premises at the residence of the defendant certain paraphernalia which these officers testified was capable of being used as a still. It was conceded that defendant did not have a license to own or operate a still, as required by the Alcoholic Beverage Control Act; and it was also conceded that defendant owned the paraphernalia referred to as a still. There was some evidence, also, that a little whiskey was running from a drainpipe in the kitchen sink to a sump hole in the back yard, which was the only circumstance indicating that the defendant had ever used the paraphernalia as a still. We think it may justly be said that the evidence falls far short of indicating that the defendant

ever used the paraphernalia in question as a still; and therefore his conviction can be sustained only by proof that the property in question was "capable of being used as a still" within the meaning of the statute. In this connection, one of the officers testified as follows:

"Q. Then you went to the property with a search warrant?

"A. I did.

"Q. What time did you get back?

"A. Approximately an hour later.

"Q. Tell us what happened when you got back.

"A. When I got back there I immediately went to the rear of the house and in front of this small shed which is back there was all this, these exhibits.

"Q. By these exhibits you mean what articles?

"A. Well, everything with the exception of the bottles.

"Q. First let's pick out the ones you actually saw there in that location.

"A. I saw this large pot, this pot, this barrel and four others.

"Q. Just like it?

"A. Different sizes, one smaller, one the same, and two larger. I saw this can and another just like it, both containing the same thing, oak chips, and there were five five-gallon cans which we destroyed on the premises which were also by the shed.

"  . . .

"Q. I will ask you whether or not oak chips are used in the manufacture of whiskey?

"A. They are.

"Q. For what purpose?

"A. For giving the color to clear spirits. In other words, clear spirits are a product from a still, and, of course, chips are more or less used as a dye to give the spirits the usual color of whiskey.

"Q. All right, now, calling your attention to the coils that appear here, did you see those coils there that day?

"A. I did.

"Q. Where did you see them?

"A. I first saw them when Officer Hennessy was pulling them out from this pile of scrap wood which was behind the house.

"Q. That was the pile near the shed you spoke of?

"A. Well, it was about 30 feet away from the shed.

" . . .

"Q. . . . Now, then, did you go inside of the house?

"A. I did.

"Q. And did you find anything in there?

"A. Yes.

"Q. What did you find?

"A. I found the 27, I believe there are, empty whiskey bottles, pint and half-pint sizes, and also the alcohol hydrometer which is on the top of the kettle there.

"Q. That is this object here?

"A. That is part of it. It is evidently broken, but the other half is there.

" . . .

"Q. You speak now of the coil marked People's Exhibit 3 for identification?

"A. Yes. The coil would be inserted in the dome of this kettle part, and this needs to be sealed, you can wrap a piece of friction tape around it and I have seen flour and water used, dough to seal it. . . .

" . . .

"A. This apparatus is bent and set over a fire, or set up over a stove, the fire then applied and this coil can be bent, any part of it, put through a small pan of water which is the usual custom, or a bucket or a tub, the heat then vaporizes the alcohol which is in the mash and the alcohol will vaporize at a much lower temperature than the water, therefore it vaporizes first and comes up through the dome and through the coil as vapor, and as it gets further on in the coil it is cooled so that it condenses, particularly when it goes through that part of the coil which would be submerged in the water, it condenses and then becomes a very concentrated form of alcoholic spirits."

Further in the testimony of this same officer we find the following:

"Q. I take it, officer, you are an expert, that is, you have a thorough knowledge of the operation of stills?

"A. I have.

"Q. Assuming I took that pot and attached the copper tube or any kind of tube, and run it into a bucket of water and put mash in it, put it over the stove, lighted the burner, could you make alcoholic spirits?

"A. Absolutely you could."

While it is true that appellant himself testified that the material and paraphernalia received as exhibits were junk, and that he did not use or intend to use the same for the manufacture of alcoholic beverages, and also produced testimony to the effect that even when these parts were assembled together, they did not constitute a still, the ultimate question as to the character of the materials and their adaptability for setting up a still was one of fact for the jury to determine. In *People* v. *Kiser,* 24 Cal. App. 540 [141 Pac. 1078], it was held that the direct testimony of the accused may be so contradicted even by circumstantial evidence alone that the jury need not believe it. Also, it is a well-established principle of law in this state that although the defendant's own story and that of witnesses presented in his behalf exculpate him, it is for the jury to say whether his story and those of his witnesses should be believed. (*People* v. *Rongo,* 169 Cal. 71 [145 Pac. 1017]; *People* v. *Sears,* 119 Cal. 267 [51 Pac. 325]; *People* v. *Billings,* 34 Cal. App. 549 [168 Pac. 396]; *People* v. *Stephens,* 29 Cal. App. 616 [157 Pac. 570, 572].) In the instant case, the jury's verdict indicates that they did not believe the appellant's story, nor were they favorably impressed by the testimony of his witnesses to the effect that the articles in question did not measure up to the standard of being the component parts of a still; but, on the contrary, found as a fact, upon substantial evidence produced by the prosecution, that the materials and paraphernalia in question were ''capable of being used as a still''. While a mere reading of the record in this case might leave one in some doubt on the question of defendant's guilt, there is certainly enough in the evidence to sustain the conclusion of the jury and trial judge, who saw and heard the various witnesses, and who were in a much better position to determine the truth than a court that does not possess such an advantage. Appellant's contention that the still found on the premises was not completely set up is met by the evidence that the still was complete and, had the parts been assembled, could have been used for the unlawful purpose of manufacturing alcoholic beverages. When there is added to the foregoing the testimony with reference to the possession of a quantity of empty whiskey bottles, some five-gallon cans, and some ''oak chips'' which, it was testified, are used for giving the color of whiskey to clear spirits when they emerge from the

still, there seems to be little room for doubt but what the jury was justified in its verdict. The inference and conclusion at which the jury arrived is also considerably strengthened by the testimony of one of the officers, as follows: ''And Shellenberger made the statement, this is the first time in his life he had ever done anything like this and he should have known he couldn't get away with it.''

Appellant finally contends that reversible error was committed by the trial court in the giving of an instruction as follows: ''You are instructed that when a defendant, under conditions which fairly afford him an opportunity to reply, stands mute in the face of an accusation of crime, the circumstance of his silence may be taken against him as evidence indicating an admission of guilt. The only purpose for which an accusatory statement is received in evidence is to show acquiescence or admission on the part of a defendant in the face of an accusatory charge, and unless you are convinced beyond a reasonable doubt that the defendant did stand mute when the accusatory statements were made such statements should be entirely disregarded by you.''

This instruction should not have been given, because nowhere in the transcript do we find evidence of any occasion when appellant remained silent in the face of an accusation which would naturally call for a reply. While it is true that the question as to whether the circumstances are such as to make the failure to reply proper evidence tending to show an admission is, in the first instance, a question for the trial court, there should be testimony constituting a *prima facie* showing that the statement was one that might under all the circumstances shown be held to naturally call for some action or reply on his part, and that the occasion and circumstances were such as to afford him an opportunity for reply. In the instant case, we find certain accusatory statements made by the officers in the presence of appellant and his co-defendant, the latter of whom was acquitted, but these statements were directed to both defendants, and the transcript indicates that the defendant Hardy made reply and also that appellant made the incriminatory statement heretofore ascribed to him. Where, as in the instant case, the accusatory statement was addressed to two defendants, and one of them makes a reply, it does not present a situation under which an occasion exists which would naturally call for a

reply from the other defendant. If the accusatory statement were addressed to a particular defendant, or if it were addressed jointly to two or more defendants, and none of them replied, then the failure of any of them to reply might result in a situation where, if a reply was naturally called for by the accusatory statement, the silence of all of them could be shown in evidence. But such is not the case here. Therefore this conversation, other than the admission on the part of appellant, was purely hearsay as to him. It is well settled that simply because a statement is made in the presence of the defendant, it is not *per se* admissible against him, and the hearsay rule applicable to such statements remains in full force and effect, except under conditions and circumstances which were not here present. (*People* v. *Smith, ante*, p. 241 [77 Pac. (2d) 277].) However, the evidence against appellant is so substantial that we cannot say that the verdict might have been otherwise had the erroneous instruction not been given. Therefore, impressed as we are that there was no miscarriage of justice in the conviction of appellant, the constitutional provision (sec. 4½, art. VI) prohibits us from disturbing the jury's verdict.

The purported appeal from the sentence is dismissed.
The judgment is affirmed.

York, P. J., and Doran, J., concurred.