[Crim. No. 4657. In Bank. Aug. 16, 1946.]

THE PEOPLE, Respondent, v. ALGER SIMMONS, Appellant.

Leola Buck Kellogg and Montgomery G. Rice for Appellant.

Robert W. Kenny, Attorney General, and Frank Richards, Deputy Attorney General, for Respondent.

CARTER, J.—The questions presented by this appeal concern alleged errors in the presentation of evidence and in charging the jury.

By amended information defendant was charged with the commission of crimes committed on January 5th and January 22d, 1945, respectively. Counts 1 and 2 charged the robbery on January 5th of Mrs. Carrie Ellingson of $639.87 and of Ray R. Byrnes of one package of cigarettes of the value of 15 cents. Counts 3, 4 and 5 charged the murder on January 22d of Virgil Marques, robbery of Leonard E. Brown of $425, and assault upon said victim with a deadly weapon with intent to commit murder. A prior conviction of petty theft with prior petty theft, in June, 1942, was also alleged with respect to each count. One Theodore Bernard Webb was originally named as a codefendant, but pleaded guilty. Defendant pleaded not guilty, except that when the cause was called for trial he admitted the prior conviction.

At the close of the trial the jury returned verdicts finding defendant guilty of first degree robbery on counts 1, 2 and 4, of murder of the first degree on count 3, without recommendation as to punishment, and of assault with a deadly weapon, a lesser offense included in the offense charged in count 5. Motion for new trial was denied, and defendant was sentenced for the terms prescribed by law on counts 1, 2, 4 and 5, with the admitted prior, the sentences to run consecutively, and to death on count 3.

After arraignment on the original information, defendant substituted new counsel for the attorney who was then representing him and Webb. A week later the public defender was substituted as counsel and represented defendant up to the time of his appeal. New counsel were then again substituted.

At the time of commission of the crimes, defendant, a colored man, was about 30 years of age and had a criminal record. Webb, also colored, was about 23 years old, and claims that with the exception of some juvenile delinquency, he had not theretofore engaged in any wrongdoing. The evidence relating to the robberies charged in counts 1 and 2 shows the following:

The victim Byrnes was a salesman for a furniture company located on West Washington Boulevard, Los Angeles, and Mrs. Ellingson was bookkeeper and cashier for the concern. On Friday and Saturday the store was kept open until nine in the evening. It was well lighted and its eight large display windows were decorated to portray separate rooms, each advertising a particular type of furniture. On Friday evening, January 5, 1945, between 8:30 and closing time, defendant entered the store, followed by Webb and a third man referred to as Jefferson. Defendant asked to see certain furniture and Byrnes led him toward the third display window. When the two were alone, defendant poked a gun at Byrnes and ordered him to walk to the cashier's office. Meanwhile Webb had asked Mrs. Ellingson about an account under the name of Jefferson, and when she told him there was no account listed under that name, he pulled a long dagger shaped knife from his pocket, and ordered her to walk into her office. A few minutes later Jefferson came in.

Knowing that the men wanted money, Mrs. Ellingson walked to the safe and opened the two general drawers. Webb was not satisfied with the amount he found there and later found

the surplus money drawer. In all $621.37 in currency and silver were taken. Mrs. Ellingson was pushed back of a little partition, where there was a telephone and was gagged with a dirty handkerchief. Her hands were tied behind her back. Defendant brought Byrnes in. He was threatened and "frisked," and a package of cigarettes was taken from his person. He was then also pushed behind the partition, made to lie on the floor, and his hands were tied behind his back. From one of the drawers of the safe the robbers extracted a revolver which had been placed there by the store manager and which was identified by him on the trial as People's Exhibit 3. In all the robberies consumed about 12 minutes of time, and after the men left with their loot, Byrnes and Mrs. Ellingson soon freed themselves. On the trial both were positive in their identifications of defendant and Webb.

On January 9th defendant was arrested for the alleged robbery of a service station and for the above robberies, and his 1939 Pontiac car was impounded by the police, and turned over by them to a finance company. However, defendant gave bail and on the same day procured his release on writ of habeas corpus. Thereafter he recovered his car. While he was still at liberty the crimes of January 22d, charged in counts 3, 4 and 5, were committed.

On his appeal defendant does not question the sufficiency of the evidence to sustain his conviction under count 1 for robbery of Mrs. Ellingson, but with respect to the conviction under count 2 for robbery of Mr. Byrnes, he asserts that there was no proof that the package of cigarettes taken from the person of the victim had any value whatsoever, and that the court may not take judicial notice of value. ▉ Judicial notice may be taken, however, of the fact that an item of personal property has some value. ▉ The amount is immaterial for, as said in *People* v. *Thomas,* 45 Cal.App.2d 128, 135 [113 P.2d 706], ". . . robbery does not depend upon the value of the property taken. The other elements being present, the crime is made out even though the property taken be of slight value (citing authorities) ; . . ." To the same effect see *People* v. *Stevens,* 141 Cal. 488, 489-490 [75 P. 62], and cases there cited.

The evidence with reference to the crimes of January 22d, charged in counts 3, 4 and 5, shows the following : On January 22d Leonard E. Brown was operating a service station

at 3100 West Sixth Street, Los Angeles. About seven in the evening Mr. Brown had turned off all of the electric lights in the store except the one in the office. As he was about to turn off this light defendant entered the door, followed by Webb who was holding in his hand a revolver similar in appearance to the one stolen from the furniture store, aforesaid Exhibit 3. Defendant grabbed Brown's hand, whereupon Brown seized defendant around the waist in an effort to throw him out. However, Brown was then hit above the eye and was dazed. He thinks the blow was by Webb with a gun. He was then pushed through the partition door into the storeroom by defendant and ordered to get down on his knees. When he hesitated defendant hit him twice with a tire iron, and when he was on the ground, hit him some more.

Defendant next ordered Brown to open the safe in the storeroom. When Brown said he did not know the combination, he was hit again with the tire iron. While he was down looking at the floor, as ordered, he heard the cash register in front open and heard a man's voice say, "He will be out in a minute." The man with Brown ordered him to keep his head down, pushed his face to the floor, and started to tie his hands in back with a rope. This was not completed. Brown heard a shot, but because blood was obscuring his sight he did not see whether the man with him had at that time left the room. It is his belief that defendant was with him in the back room during the entire period, including the time the shot was fired. Four hundred dollars was taken from his hip pockets, gasoline ration coupons representing 882 gallons were taken from his pockets and the desk drawer, and $40 in silver was taken from the cash register. This represented Saturday, Sunday and Monday business. After hearing the shot Brown got up, released himself from the rope, and made his way to the entrance door. All was quiet and as he went out he stumbled over the dead body of Virgil Marques lying in the front doorway. Brown may have been unconscious for part of the time while the men were inside his station. The cut over his eye required seven stitches; his jaw was fractured, both eyes were black; his face was bruised; and the hearing in his left ear impaired.

A service station diagonally across the street from Brown's was operated by a Mr. Frank Fusco. He heard a yell, looked toward the Brown station, and saw a colored man in the doorway. He heard another yell, went in the office next to

his station, phoned the police, and then went into his home next door, and got his automatic revolver (Ex. 13), which was loaded but had a safety catch.

Virgil Marques rented and operated a repair shop in the rear of the Fusco garage. He was standing near a flower bed on the station property next to the Fusco home. As Fusco came by with his automatic, Marques grabbed it out of his hand, jumped into his repair truck, and drove across the street to Brown's station, stopping right in front of the door. Fusco walked across unarmed and stood at the corner of the office. He saw a colored man in the doorway and saw that Marques had the gun in his back. Fusco called, "Give it to him," but the gun did not go off. Marques may not have known how to release the safety catch and throw a bullet into the chamber, or may have been afraid to fire. At any rate Fusco saw another colored man come from the rear and grab the hand of Marques. Both of these men grabbed at Marques and had his gun hand up in the air as he tried to pull it down. Then two shots were fired and Marques fell out of the doorway. Mr. Fusco was within 10 feet of the men and positively identified defendant as one of them. He did not see any gun other than that held by Marques.

After the firing of the shots the men came toward Mr. Fusco, and thinking that they were following him, he ran down the street and ducked into a driveway. Two shots were fired at him and he was hit in the stomach. It developed later that these shots were fired by the police, who saw Mr. Fusco running and thought he was the robber. Upon autopsy on the body of Marques, it was found to bear two bullet wounds, the fatal wound being made by a pellet fired from the revolver Exhibit 3.

The father of Webb testified that Webb and defendant left his home about 6 o'clock on the evening of January 22d, in defendant's 1939 Pontiac sedan, bearing license No. 18 W 831, which defendant had recovered from the finance company after January 9th. When the police arrived at the scene of the murder about 7:15, this car was parked just south of the gas station, with the radiator still warm. The police impounded the car. Keys fitting the car were found on the station pavement. One of the officers found the revolver, Exhibit 3, on the lawn of the premises a few doors from the station. It contained four empty cartridges.

On the morning of the 23d a Mrs. Carter, who lived at the Sanmark Hotel, saw defendant in the room of Maxine Woods, who also lived there and from whom Mrs. Carter was seeking to borrow a broom. Defendant told Mrs. Carter to say he had been there in bed at 6 o'clock the evening before if anyone inquired about him, showed her newspaper pictures of the robbery, and told her that his car had been stolen. He took $200 or $300 from his billfold and gave it to Maxine, saying: "Well, if they pick me up I don't want this on me." He spoke abusively to Mrs. Carter because she would not promise to lie for him, and later said to her boy friend, "I was in this little robbery last night."

On January 25th one of the police officers found the automatic pistol, Exhibit 13, near a signboard on Wilshire Boulevard, together with about $45 and a number of gas stamps buried about 10 inches underground. A dollar bill, a glove, and a gas stamp were found above ground. Eight loaded shells were in the pistol, with the safety on, and the gun could not be fired. The mate to the glove was found in the vicinity.

On January 27th, defendant, who had been traveling around with Maxine Woods, seeking a hiding place, was arrested at a colored settlement at Fontana, San Bernardino County, known as the L & M Ranch. Defendant had observed the approach of the police and had hidden successively in the pigsty, the chicken coop, and above ground in a tree. He told the officers he feared arrest only because somebody had stolen his car and used it in a holdup, and because he had been charged with one crime and did not want to be mixed up in another. Maxine Woods was also apprehended and made a statement to the police in which she told about defendant's visit to her room after the crime and her travels with him to evade apprehension. Webb was arrested on January 30th. He too gave statements to the police.

Webb, who was originally charged as a codefendant with defendant, entered a plea of guilty, and prior to the trial of this cause his case was disposed of by the imposition of a sentence less than death. At the present trial, at the insistence of defendant, but contrary to the advice of his counsel, the public defender, Webb was called as the first witness for the defense. His testimony was replete with evasions, inconsistencies and contradictions. He repudiated his former statements, saying that they had been induced by abuse of

the police officers. He told the unbelievable story that he borrowed defendant's car, ostensibly to help his girl friend move, that he then picked up a companion whom he had met a week previously in a pool hall, and that after looking for a place to rob, they chose the Brown service station. Although Webb recalled clearly certain details of the crime, at one point in his direct examination he professed not to be able to remember whether he had the gun or whether his companion had it at the time Marques was shot. At another point on cross-examination, and after he had been repeatedly assured by the judge that his case had been disposed of and he would not incriminate himself by any statement, Webb testified that he was the one who had the gun, Exhibit 3, and that he himself fired the fatal shot. He claimed that defendant came by his house subsequent to the crime to retrieve his car and that he told defendant all that had happened; that his companion in the crime vanished, having expressed an intention of going to Mexico.

Later defendant took the stand in his own behalf and attempted to conform his narration of events to that given by Webb. He claimed that at the time of the crime Webb had his car and he was in Maxine's room playing Pokena, and that he stayed there until 8:30, when he left to try to locate Webb. He also claimed he had been mistreated by the police and repudiated parts of a statement he had made to them. He gave a different version than did the officers of his response to accusatory statements. He said that he told the officers that Webb lied like a dog in his statement, and that while Maxine told a "pretty good story" parts of it were untrue.

The sufficiency of the evidence to support the verdicts under counts 3, and 4 and 5 is beyond question. Defendant virtually concedes this, for among other things he states in the premise to his opening brief: "In order to present most clearly the vital errors as to Count III, the homicide sentence, the errors will be presented chiefly in their relation to that sentence. . . . Further to emphasize the vital errors as to Count III, the homicide, this brief will not contest the adequacy of the evidence to show that this [defendant] conspired with an accomplice and original co-defendant, Webb, to rob the service station of one Leonard Brown, that they made the attack and that in the course of the robbery or of the escape, one

of the robbers shot and killed Virgil Marques as he was coming to rescue.''

Another concession by defendant is couched in the following language: ''Of course, this brief will not contest the point of law that where a murder is committed by one of two robbers, confederates, each or both may be found guilty of murder in the first degree and, in a proper case, after a fair and impartial trial adhering to due process, the jury, in the exercise of its sole discretion, must determine as to each defendant whether he is to expiate the murder by his death or by confinement in the state prison.'' Thus defendant recognizes that regardless of whether it was he or Webb who actually fired the fatal shot at Marques, both were subject to conviction of first degree murder and imposition of a death penalty.

But defendant argues that if it was Webb who actually fired the shot, it is highly unfair for Webb, through a plea of guilty, to enjoy a sentence of less than death while defendant must pay the extreme penalty. And in this connection, and also with respect to other points raised by the appeal, the present counsel for defendant charge that his trial attorney, the public defender, was guilty of numerous errors of omission and commission in his conduct of the defense. In the cases of omission, such as the public defender's asserted failure to introduce available evidence helpful to defendant, and his asserted failure to object or preserve objections to improper evidence or to request appropriate instructions, the present counsel recognize that ordinarily these matters do not furnish grounds of reversible error. But it is argued that where a defendant is represented by court-appointed counsel or by a public official, instead of by counsel of his own choosing, and such official is derelict in duty, the failure of proper defense is a failure of the court itself to afford the defendant due process and a fair trial, and such errors must be considered on appeal despite the absence of proper objections and the fact that the errors arose through no fault other than that of defendant's representative. Assuming this to be so, none of the matters urged by present counsel appear to have prejudiced defendant.

The first error of omission is said to be the public defender's failure to introduce in evidence a transcript of the testimony taken on the preliminary hearing. This testimony is said to be very favorable to defendant, in that Brown

then gave a most convincing account of the part played by each of the two men in the commission of the robbery and murder and he was far more definite than at the trial in his view that defendant stayed with him in the rear room, thus leaving Webb as the man in front who fired the fatal shot. For a consideration of this point, this court, without objection by the prosecution, permitted augmentation of the record to include the preliminary transcript. A review of the testimony therein shows that defendant was not prejudiced by failure to introduce it at the trial. The matters shown are at most cumulative, and would have added little if anything to the strong showing made at the trial leading to the conclusion that it was Webb, and not defendant, who was in the front office at the time of the shooting. Under the facts, which show no extenuating circumstances, it is wholly improbable that the jury, believing defendant to have been one of the pair who carried out the robbery, and murder, would have rendered any different verdict if the transcript had been introduced. The fact that Webb received a lesser sentence than death does not affect the disposition of the cause against defendant.

Complaint is made of three instances where accusatory statements were received in evidence without objection on the part of the public defender.

One of the officers testified that while defendant was being driven to Los Angeles after his arrest, a conversation was had wherein defendant attempted the explanation that someone stole his car and used it in a holdup; that the officer said he would tell defendant what happened; that he then told defendant the results of the police investigation which revealed the circumstances under which the robbery and murder were committed; that he thereupon asked defendant what he thought about the story; and that defendant replied, "I have told you all I am going to tell you. Somebody stole my car, and that is all I have to say."

There was received in evidence a nine page sworn statement of Maxine Woods, wherein she recited conversations allegedly had with defendant. The officers testified that this statement was handed to defendant and that he read it from beginning to end. He was asked, "Did you read it all?", and he said, "Yes." He was then asked, "Well, what do you think of it? Did she tell everything?", to which defendant

replied, "Well, she told enough," and in response to the further question, "What do you think about it?", defendant said, "I told you all I am going to tell you. I have nothing more to say."

There was also received in evidence a statement made by Webb. The officers testified that this statement was also handed to defendant to read, after which the following conversation was had: "He [defendant] handed me the statement back and I said, 'Did you read it all?' He said, 'Yes.' I said, 'What do you think about that? Did he tell it all?' He said, 'It looks like he told it all and about every body.' I said, 'Well, what do you think about it?' He said, 'I have told you all I am going to tell you, I am not going to tell you anything else.' I said, 'Did you read in there where he said you are the one that shot the man, that you had the pistol and you killed the man?' He said, 'Yes, I read that.' I said, 'Well, do you admit that or deny it?' He said, 'I have told you all I am going to tell you, I have nothing more to say.' "

▮▮ Accusatory statements of the character here involved are plain hearsay. They may properly find their way into the record only as admissions, under the familiar exception to the hearsay rule. ▮▮ If the accused responds to the statement with a flat denial, there is no admission and hence nothing that may be received in evidence. ▮▮ If, on the contrary, the truth of the statement is admitted, the statement may properly be introduced. ▮▮ A third situation is presented when the accused stands mute in the face of the accusation or responds with an evasive or equivocal reply. In that situation this court has held that *under certain circumstances* both the statement and the fact of the accused's failure to deny are admissible on a criminal trial as evidence of the acquiescence of the accused in the truth of the statement or as indicative of a consciousness of guilt.

The theory underlying this rule is that the natural reaction of an innocent man to an untrue accusation is to enter a prompt denial. Where his response is silence, evasion, or equivocation, it is for the trial court to determine in the first instance whether the accusation has been made under circumstances calling for a reply, whether the accused understood the statement, and whether his conduct or response was such as to give rise to an inference of acquiescence or guilty consciousness. Where the trial judge determines that such an inference may be drawn, the statement is then ad-

mitted, not as substantive evidence in proof of the fact asserted but merely as a basis for showing the reaction of the accused to it. As stated in *People* v. *Yeager,* 194 Cal. 452, 486 [229 P. 40] : "It is for the court in the first instance to determine whether the import of the statements is such that it would furnish a foundation for proof of conduct, and it is then for the jury to decide whether the accused was aware the statements were made, whether, under all of the circumstances shown, they called for a disclaimer, whether the accused did reply to them, and whether if he did not do so, such failure showed criminal intent or a consciousness of guilt. If these propositions of fact are resolved in favor of the prosecution the item of conduct should be given the effect to which upon the entire case it is entitled." For other general statements of the rule see *People* v. *Lew Fat,* 189 Cal. 242 [207 P. 881] ; *People* v. *Ong Mon Foo,* 182 Cal. 697 [189 P. 690] ; *People* v. *Lapara,* 181 Cal. 66 [183 P. 545] ; *People* v. *Byrne,* 160 Cal. 217 [116 P. 521] ; *People* v. *Philbon,* 138 Cal. 530 [71 P. 650] ; *People* v. *Teshara,* 134 Cal. 542 [66 P. 798] ; *People* v. *Amaya,* 134 Cal. 531 [66 P. 794] ; *People* v. *Estrado,* 49 Cal. 171; *People* v. *McCrea,* 32 Cal. 98; *People* v. *Peterson,* 66 Cal.App.2d 420 [152 P.2d 347] ; *People* v. *Shellenberger,* 25 Cal.App.2d 402 [77 P.2d 506] ; *People* v. *Smith,* 25 Cal.App.2d 241 [77 P.2d 277] ; *People* v. *King,* 7 Cal.App.2d 672 [46 P.2d 798] ; *People* v. *Egan,* 133 Cal.App. 152 [23 P.2d 1042] ; *People* v. *Bisbines,* 132 Cal. App. 239 [22 P.2d 762] ; *People* v. *Holmes,* 130 Cal.App. 507 [20 P.2d 67] ; *People* v. *Susoeff,* 129 Cal.App. 78 [18 P.2d 442] ; *People* v. *McCoy,* 127 Cal.App. 195 [15 P.2d 543] ; *People* v. *Smith,* 111 Cal.App. 579 [295 P. 862] ; *People* v. *Piscitella,* 90 Cal.App. 528 [266 P. 349] ; *People* v. *Egan,* 77 Cal.App. 279 [246 P. 337] ; *People* v. *Edwards,* 72 Cal.App. 102 [236 P. 944] ; *People* v. *Shelest,* 62 Cal.App. 213 [216 P. 389] ; *People* v. *Graney,* 48 Cal.App. 773 [192 P. 460] ; *People* v. *Ayhens,* 16 Cal.App. 618 [117 P. 789] ; 8 Cal.Jur. § 196, p. 102; 20 Am.Jur. § 570, p. 483; 115 A.L.R. 1510.

That silence or an equivocal reply is not always indicative of a consciousness of guilt cannot be gainsaid, for the Scriptures bear witness that when Jesus stood under accusation before Pontius Pilate, the governor, and was asked, "Art thou the King of the Jews?", he replied, "Thou sayest," and "when he was accused of the chief priests and elders, he an-

swered nothing. Then said Pilate unto him, Hearest thou not how many things they witness against thee? And he answered him to never a word; insomuch that the governor marvelled greatly." (Matt. chap. 27, v. 11-14; 4 Wigmore on Evidence § 1072, pp. 84-85.)

It is also apparent that when a person is in the hands of his accusers he may well and soundly conclude that his best interests will be served by silence, evasiveness, or equivocation. For this reason, in a number of jurisdictions it has been held that the mere fact of arrest is sufficient to render inadmissible the fact of the accused's failure to deny accusatory statements when made in his presence and hearing. These courts maintain that it is the common knowledge and belief of men in general that silence while under arrest is most conducive to the welfare of an accused whether he be guilty or innocent; that the maintenance of silence is the best strategic policy for one in the custody of the law, and that it is entirely consistent with innocence. (See 2 Wharton's Criminal Evidence (11th ed.) § 661, p. 1101; 80 A.L.R. 1262; 115 A.L.R. 1510; 20 Am.Jur. § 574, p. 486, citing cases from Colorado, Connecticut, Georgia, Idaho, Indiana, Iowa, Louisiana, Missouri, Nebraska, New York, Ohio, Oklahoma, Rhode Island, Texas, and federal decisions.) Other jurisdictions, including California, have adhered to the more flexible rule that the fact of arrest, alone, may not be sufficient to render the testimony inadmissible, but that such fact deserves consideration as one of the circumstances under which the accusation was made, in determining whether the accused was afforded an opportunity to deny and whether he was naturally called on to do so. (See 2 Wharton's Criminal Evidence (11th ed.), supra; 80 A.L.R. 1259; 115 A.L.R. 1517; 4 Wigmore on Evidence (3d ed.) § 1072, p. 80, and cases cited, particularly from Alabama, California, Hawaii, Illinois, Indiana, Kentucky, Michigan, Montana, Ohio, Pennsylvania, West Virginia and Wisconsin.)

It is recognized that those decisions which announce the rule of inadmissibility stem for the most part from acceptance of an early Massachusetts precedent (*Commonwealth* v. *Kenney*, 12 Metc. 235 [46 Am.Dec. 672]). Courts taking the opposite view charge that those decisions have misconstrued the Massachusetts rule, and point out that in the Kenney case there were other circumstances existent which, apart from the mere fact of arrest, would have prevented a reply by

the defendant, and that it was upon these circumstances also, and not only the fact of arrest, that the evidence was excluded. (See discussion 80 A.L.R. 1266, 4 Wigmore on Evidence (3d ed.), p. 80.)

Early California cases foreshadowed adoption in this state of a limited rule of admissibility (*People* v. *Dole*, 122 Cal. 486 [55 P. 581, 68 Am.St.Rep. 50] ; *People* v. *Estrada*, 49 Cal. 171; *People* v. *Ah Yute*, 53 Cal. 613; *People* v. *McCrea*, 32 Cal. 98), and when the question was directly presented, such a rule was adopted and the Kenney case was distinguished (*People* v. *Amaya*, 134 Cal. 531, 536, et seq. [66 P. 794]). This court said: "It is no doubt true, that, to render evidence of this character admissible, *the occasion and the circumstances* must have been such as to afford the accused person an opportunity to act or speak, and the statement must have been one naturally calling for some action or reply. (Greenleaf on Evidence, par. 197.) But in this state it has been uniformly held that an accusation of crime does call for a reply, even from a person under arrest. (citing cases.)" (Emphasis added.) This rule has since been consistently followed (*People* v. *Matthew*, 194 Cal. 273 [228 P. 424] ; *People* v. *Ong Mon Foo*, 182 Cal. 697, 703 [189 P. 690] ; *People* v. *Schoon*, 177 Cal. 678 [171 P. 680] ; *People* v. *Byrne*, 160 Cal. 217, 234 [116 P. 521] ; *People* v. *Sanchez*, 35 Cal.App.2d 231, 235 [95 P.2d 169] ; *People* v. *Fallai*, 99 Cal.App. 297, 303 [278 P. 449] ; *People* v. *Shelest*, 62 Cal.App. 213, 217 [216 P. 389] ; *People* v. *Willis*, 70 Cal.App. 465, 469 [233 P. 812] ; *People* v. *Graney*, 48 Cal.App. 773 [192 P. 460] ; *People* v. *Swaile*, 12 Cal.App. 192, 198 [107 P. 134] ; *People* v. *Sullivan*, 3 Cal.App. 502 [86 P. 834].)

■ Properly applied, the limited rule of admissibility appears to be preferable to that of strict nonadmissibility on ground of arrest only, for the determinative point is not whether the defendant is under arrest at the time of the accusation, but is whether the circumstances are such that a reply is called for and the defendant is free to speak spontaneously. Arrest is but one form of restraint that at times might bar a free response. ■ Many other forms of restraint have the same effect, such as fear, physical pain, suffering, advice of counsel, admonition as to silence, warning against self-incrimination, a belief that the accused will serve his best interests by silence, or other physical or mental pressure. A response under any of these forms of restraint may be such as

will not give rise to an inference of acquiescence or guilty consciousness, and thus it is said on the question of admissibility that "the better rule is to allow some flexibility according to circumstances." (4 Wigmore on Evidence (3d ed.) § 1072, p. 81.)

In this state, under a proper application of the rule, it has at times been held either by the trial court in the first instance, or by the courts on appeal, that the surrounding circumstances were not such as to render the evidence admissible. (See *People* v. *Davis,* 210 Cal.540, 553 [293 P. 32]; *People* v. *Kelly,* 203 Cal. 128 [263 P. 226]; *People* v. *Wong Loung,* 159 Cal. 520, 531 [114 P. 829]; *People* v. *Weber,* 149 Cal. 325 [86 P. 671]; *People* v. *Williams,* 133 Cal. 165 [65 P. 323]; *People* v. *McEvers,* 53 Cal.App.2d 448, 452 [128 P.2d 93]; *People* v. *Smith,* 25 Cal.App.2d 241, 247 [77 P.2d 277]; *People* v. *Kazatsky,* 18 Cal.App.2d 105, 111 [63 P.2d 299].) In many other cases, as above cited, even where the defendant was under arrest at the time of meeting the accusation, the evidence has been admitted.

There appears, however, of late to be a growing tendency on the part of trial courts to indulge too broad a discretion in allowing admission of such evidence in the first instance; a failure to fully consider the question of whether the accused replied under restraint; whether the circumstances under which the accusation was made called for a reply; whether the accused understood the statement; and whether his conduct merely indicated a desire to avail himself of the rule against self-incrimination or whether it could reasonably give rise to an inference of acquiescence or guilty consciousness.

Obviously, when a defendant repeatedly asserts, as did the defendant here, "I have told you all I am going to tell you," and is repeatedly pressed by police officials into further conversation, his response is not a free and spontaneous one. It is made under mental, if not physical coercion, exercised by the police officials, and this despite the fact the defendant's replies clearly indicate a desire to take advantage of the rule against self-incrimination. Of what avail is it to warn a defendant that he need not reply to police questioning unless he wishes to, and that anything he may say may be used against him, if, in the event he is unresponsive under this admonition, his silence or equivocal reply is later turned against him as indicative of a consciousness of guilt?

There is another growing practice in the use of the

accusatory statement which is erroneous and must be unqualifiedly condemned. It is described by textwriters in the following language: "A practice popular among police officials as a means of obtaining evidence by means of tacit admissions is that of reading detailed statements of the crime purportedly made by a codefendant or companion in the crime with a view toward eliciting either a complete confession or an admission by silence, to be used against the defendant to whom the statement is read." Such statements have been held to be inadmissible when sought to be introduced upon the ground that they were tacitly admitted. Some reasons given for such holdings are that there was no necessity for denying or answering the statement read, and that the circumstances and occasions were not such as to afford the accused an opportunity to deny, or such as to naturally call for a ·contradiction. (2 Wharton's Criminal Evidence (11th. ed.) § 660, p. 1098, and 80 A.L.R. 1255, citing cases from Nebraska, Washington, South Carolina, and England.)

Another objection to this form of evidence is that there is placed before the jury under the guise of an accusatory statement a vast amount of hearsay testimony otherwise utterly inadmissible. Lengthy statements are taken by the police from third persons who may or may not thereafter be witnesses. (In the present case the statement of Maxine Woods is nine pages long.) The defendant, under arrest, is then asked to read the statement. If it contains indications of his guilt and he responds with other than a flat denial, the statement is then put in evidence as an accusatory statement. Although the jury may properly be cautioned to receive it, not as substantive evidence in proof of the facts asserted but merely as a basis of showing the reaction of the accused to it, the fact is that a lengthy transcript containing any amount of extraneous matter apart from the direct accusation is read into the ears of the jury and the matter remains in their mind during their deliberations. (See *People* v. *Yeager, supra; People* v. *King,* 7 Cal.App.2d 672 [46 P.2d 798]; *People* v. *Rhinehart,* 79 Cal.App. 499 [250 P. 203]; *People* v. *Egan,* 77 Cal.App. 279 [246 P. 337].)

If it were possible to introduce in evidence only that portion of the statement of a third person or transcript of such statement which contains an accusation and the defendant's

response thereto, the effect of such evidence might not be so damaging, but this course is prevented by the fact that if a witness testified that an incriminating statement was made without stating what it consisted of, such testimony would be objectionable as a mere conclusion (2 Wharton's Criminal Evidence (11th ed.) § 656, pp. 1091-1093). Any practice of introducing in evidence only part of a document is objectionable, and without hearing the whole statement a jury could not be sure of correctly appraising the effect of the defendant's response to it. For these reasons, it has been the practice to admit the entire statement, under proper instructions to the jury, and thus reveal to the jury a mass of hearsay matter, otherwise inadmissible.

Another objection to this method is that the accusation is, in a manner of speaking, second hand. The defendant is not confronted with the witness who made the statement to the police, but after arrest the so-called accusation is made by the police by having the defendant read the statement, or reading it to him. In such a situation, even more than under a direct attack, a defendant would be likely to assume that evasion or the maintenance of silence would be a justifiable course of action, whether innocent or guilty.

 It is, as already stated, for the trial court in the first instance to determine the import of the accusatory statement; that is, whether it has been made under such circumstances that it may furnish a foundation for proof of conduct. It is then for the jury to decide, on any statement properly admitted, whether the accused did reply to it, and whether if he did not do so, or his reply was evasive or equivocal, it showed criminal intent or a consciousness of guilt, or acquiescence. It is said in *People* v. *Yeager, supra,* page 486, that "If these propositions of fact are resolved in favor of the prosecution the item of conduct should be given the effect to which upon the entire case it is entitled." This is but another way of saying that if the jury chooses to draw from the evidence the inference that the defendant's response does indicate acquiescence, or a consciousness of guilt, it is in effect a tacit admission; that is, an admission of the accusation, or in other words, of the contents of the statement.

 For this reason, any accusatory statement and a response thereto made by a defendant under restraint, should be considered with great caution, and if the police questioning has been insistent, so that the defendant has been induced

or persuaded against his better or more considered judgment to make a response or has adopted the policy of silence, the accusatory statement should be held inadmissible by the trial judge in the first instance. The same ruling should be made if it appears that a great mass of extraneous hearsay matter will be placed before the jury through this device. Where a defendant is under mental police coercion the situation is no different than if a gun were held at his head to compel him to talk, and his response should certainly be held inadmissible unless, at the time of questioning, the defendant has been clearly advised that his reaction can be held against him as an admission. And certainly the fact that the accused is under arrest or any other form of restraint should be an important factor pointing to inadmissibility. No violation of the privilege against self-incrimination can be sanctioned.

As stated by Mr. Wigmore in discussing this privilege (8 Wigmore on Evidence (3d ed.) § 2251, p. 308 et seq.) : "No doubt a guilty person may justly be called upon at any time for guilt deserves no immunity. But it is the innocent that need protection. Under any system which permits John Doe to be forced to answer on the mere suspicion of an officer of the law, or on public rumor, or on secret betrayal, two abuses have always prevailed and inevitably will prevail; first, the petty judicial officer becomes a local tyrant and misuses his discretion for political or mercenary or malicious ends; secondly, a blackmail is practiced by those unscrupulous members of the community who through threats of inspiring a prosecution are able to prey upon the fears of the weak or the timid. . . . The real objection is that any system of administration which permits the prosecution to trust habitually to compulsory self-disclosure as a source of proof must itself suffer morally thereby. The inclination develops to rely mainly upon such evidence, and to be satisfied with an incomplete investigation of the other sources. The exercise of the power to extract answers begets a forgetfulness of the just limitations of that power. The simple and peaceful process of questioning breeds a readiness to resort to bullying and to physical force and torture. If there is a right to an answer, there soon seems to be a right to the expected answer,—that is, to a confession of guilt. Thus the legitimate use grows into the unjust abuse; ultimately, the innocent are jeopardized by the encroachments of a bad system."

An early comment on the police practice of proving guilt through inducing self-incrimination is found in the History of the Criminal Law, by Sir J. F. Stephen, as quoted by Mr. Wigmore at page 312: ''There is a great deal of laziness in it. It is far pleasanter to sit comfortably in the shade rubbing red pepper into a poor devil's eyes than to go about in the sun hunting up evidence.''

In an opinion rendered in 1936 by the Committee on Professional Ethics and Grievances of the American Bar Association, the following comment is made (Opn. No. 150 (1936 ed.), p. 294): ''The prosecuting attorney is the attorney for the state, and it is his primary duty not to convict but to see that justice is done. Canon 5. To that end he should not offer as proof of a defendant's guilt statements of the defendant while in custody, obtained by the setting of traps or by persuasion or duress, or by the power of the custodian's office, even though he does not himself participate in the procurement thereof. *State* v. *Albert,* 50 La.Ann. 481, 23 So. 609; Opinion 85; *In re Robinson,* [151 App.Div. 589] 136 N.Y. Supp. 548 (Affd. 209 N.Y. 354 [103 N.E. 160].) The fact that such evidence is legally admissible, even though obtained by unlawful means (see *Olmstead* v. *United States,* 277 U.S. 438 [48 S.Ct. 564], 72 L.Ed. 944) does not alter our conclusion.''

For the foregoing reasons it is apparent that the prevailing liberality in the admission of accusatory statements and the response of the defendant thereto, made at a time when he is under arrest or other restraint preventing freedom of reply or justifying silence or equivocation, must be greatly curtailed, and particularly so where an entire transcript is sought to be introduced in evidence by this device. ▆ In the present case the statements of Maxine Woods and of the codefendant Webb should not have been admitted for any purpose against the defendant, and could properly have been used only as impeachment of said persons in case they were called as witnesses. Defendant was under restraint by the police officers. He was, or should have been advised by them, but at any rate knew from his past criminal experience, that anything that he might say would be used against him and that he did not have to make any statements. He therefore quite properly remarked, in comment on the Woods' statement, ''I told you all I am going to tell you. I have nothing more to say,'' and in comment on the Webb statement, ''I have told you all I am going to tell you, I am not going to tell you anything else.''

This, while not a denial of the contents of the statements, was certainly not an admission of their truth, and it did not lay a foundation for the introduction of such hearsay evidence under the rule herein announced. In other words, it is obvious that defendant was attempting to exercise his constitutional privilege against self-incrimination, despite the insistence of the officers upon carrying on a conversation about the contents of the statements, and that his responses were not such as could give rise to an inference of acquiescence or of guilty consciousness. In this situation it was an abuse of discretion on the part of the trial court to admit the evidence in the first instance; the circumstances were such as to foreclose it.

Although the admission in evidence of these statements was clearly erroneous, and if the evidence were so conflicting or uncertain as to create a doubt as to the guilt of the defendant, would be held prejudicial, in this case, in view of the overwhelming evidence of guilt of the defendant, exclusive of any evidence erroneously admitted, and the fact that the jury could have arrived at no other conclusion than that of guilt; and in view of the mandatory provision of section 4½ of article VI of the Constitution of California, it must be held that the error was not such as to justify a reversal of the judgment.

There was also read in evidence another statement made by Webb in the office of the district attorney on January 30, 1945. Although defendant concedes that this statement could properly have been admitted for the purpose of impeaching the story told by Webb on the witness stand, including his admission on cross-examination that he fired the fatal shot, defendant argues that its reception in evidence without narrowly limiting its purpose and effect constituted serious error. It is apparent from the record, however, that defendant suffered no prejudice. During the cross-examination of Webb he first testified that he could not remember giving the statement, but later said he recalled it. He was interrogated as to each question and answer contained in it, and admitted some answers and denied others. This evidence directly attacked the truthfulness of the testimony given by Webb on direct examination and its purpose could not have been misunderstood.

Defendant calls attention to three occurrences during the trial which he states show that the public defender did not

properly protect him from prejudice. They are as follows:

1. After a police officer had been cross-examined by the public defender and the public defender had stated "No questions," defendant personally wanted to ask the witness a question. The court instructed defendant to be quiet and advised him that he had an attorney to take care of the matter. At defendant's insistence, and with the acquiescence of the court, but against his own expressed better judgment, the public defender then asked the witness whether defendant was not arrested on January 9th for a robbery other than that of the furniture store, and the witness answered that it was for both robberies. The matter was explained in some detail. Defendant testified that he did not participate in the furniture store robbery and that he was in custody for the other robbery. In insisting that the matter be brought out, defendant obviously had in mind a proper subject of impeachment of the police officer. He cannot now complain that he was prejudiced by development of the matter which he thought was material to his defense.

2. During the direct examination of another police officer, the witness was asked to read a portion of the Webb statement, and cautioned not to read other portions. Defendant insisted that if any part of the document was placed in evidence, then all should go in. The court stated that the portions conceived to be admissible by the district attorney should be read and that if defendant so desired, he could put in the remainder later. This procedure was followed and on cross-examination the witness was told, at defendant's request, to read the omitted part. This portion contained information pertaining to the commission by defendant and Webb of another robbery after the robbery of the furniture store. If the inclusion of this matter was erroneous, the error was invited by defendant. Under the record as a whole, it was clearly not prejudicial.

3. Defendant claims that Webb should not have been called as a witness. But this witness too was called at defendant's specific and insistent request, and defendant cannot now complain that the testimony given was so full of contradictions as to be of no benefit to him.

Defendant complains of the failure of the public defender to request, or the court to give of its own motion, instructions on two allegedly vital points. One of these, the matter of limiting the purpose of the Webb statement, has

already been disposed of. The second point is that the court should have instructed the jury that the testimony of Webb, an accomplice, was to be viewed with distrust. However, since Webb was called as a witness on behalf of defendant, there was no occasion for the giving of such an instruction. (*People* v. *Melone,* 71 Cal.App.2d 291, 297 [162 P.2d 505].)

 The court gave, with certain modifications, an instruction proposed by defendant bearing on the subject of accusatory statements. If the court had properly denied the admission in evidence of the accusatory statements, there would have been no necessity for an instruction on that subject. Yet it is clear that the jury could not have been confused or misled by the charge, and for the reasons heretofore stated, defendant suffered no prejudice from it.

The judgment and order denying a new trial are and each of them is affirmed.

Gibson, C. J., Traynor, J., and Schauer, J., concurred. Edmonds, J., concurred in the judgment.

SHENK, J.—I concur in the judgment of affirmance but I dissent from that portion of the opinion which holds that the accusatory statements were inadmissible. In the first place that question is not properly before the court on this appeal. It is conceded that on the trial defendant's counsel made no objection to the admission of the statements in evidence and no motion to strike or limit its effect was made. It is the rule that unless objection to it is made at the trial such evidence is beyond attack on appeal and may be considered in support of the judgment. (*People* v. *Lawrence,* 143 Cal. 148 [76 P. 893, 68 L.R.A. 193]; *People* v. *Peterson,* 66 Cal.App.2d 240 [152 P.2d 347]; 2 Cal.Jur. § 82, p. 263; 8 Cal.Jur. § 516, p. 500; 4 Cal.Jur. 10-Yr.Supp. (1943 rev.) 909.)

Moreover, there was no error in the admission of the accusatory statements. Section 1870, subdivision 3, of the Code of Civil Procedure authorizes the admission in evidence of "An act or declaration of another, in the presence and within the observation of a party, and his conduct in relation thereto." It is the general rule in California, as elsewhere, that when a statement tending to incriminate one accused of committing a crime is made in his presence and hearing, and is not denied, contradicted, or objected to by him, both the statement and the fact of his failure to deny are admissible in a

criminal prosecution against him, as indicative of a consciousness of guilt, or as evidence of his acquiescence in its truth. (*People* v. *Yeager,* 194 Cal. 452 [229 P. 40]; *People* v. *Lew Fat,* 189 Cal. 242 [207 P. 881]; *People* v. *Ong Mon Foo,* 182 Cal. 697 [189 P. 690]; *People* v. *Lapara,* 181 Cal. 66 [183 P. 545]; *People* v. *Amaya,* 134 Cal. 531 [66 P. 794]; *People* v. *Teshara,* 134 Cal. 542 [66 P. 798]; *People* v. *McCrea,* 32 Cal. 98; *People* v. *Egan,* 133 Cal.App. 152 [23 P.2d 1042]; *People* v. *Bisbines,* 132 Cal.App. 239 [22 P.2d 762]; 8 Cal.Jur. § 196, p. 101; 20 Am.Jur. §§ 570-577, pp. 483 et seq.; 4 Wigmore on Evidence (3d ed. 1940) §§ 1069-1072, pp. 68 et seq.; 2 Wharton's Crim. Evidence (11th ed. 1935) §§ 656-665, pp. 1089 et seq.; 115 A.L.R. 1510 et seq.; 80 A.L.R. 1235 et seq.; Fricke on California Criminal Evidence, pp. 5 et seq.) Such a statement is accepted in evidence not as proof of the truth of the matters therein contained, but because it serves as a basis for the showing of the reaction of the accused to it. As has been commented, ''The crystallization of the experience of men shows it to be contrary to their nature and habits to permit statements tending to connect them with actions for which they may suffer punishment to be made in their presence without objection or denial by them unless they are repressed by the fact that the statement is true. Consequently, silence under accusation is some evidence from which the jury may infer that the accused acquiesces in the statement and admits its truth. But silence or failure to deny, of itself, unaccompanied by the statement in the face of which the accused remained silent or which he failed to deny, cannot well be testified to so as to convey meaning. The witness might testify that an incriminating statement was made without stating what it consisted of, but such testimony would be objectionable as a mere conclusion. . . . An evasive answer or one unresponsive to the declaration is tantamount to absolute silence and, when not amounting to a denial or an express admission, renders admissible both the statement and the reply under the rule as to tacit admissions.'' (2 Wharton's Crim. Evidence (11th ed. 1935) §§ 656, 657, pp.1092-1093.)

The California rule, which is in harmony with the general rule, is stated in the following language in *People* v. *Yeager, supra,* 194 Cal. at page 486: ''The admission of such evidence is an exception to the hearsay rule. Evidence of conduct is receivable if it tends to show a consciousness of guilt or intent. . . . (8 Cal.Jur. sec. 157, p. 42.) Such evidence is not

admissible for the purpose of proving the truth of the accusatory statements, but rather as indicating a consciousness of guilt on the part of the accused by allowing an imputation opposed to the presumption of innocence to pass unchallenged. It is for the court in the first instance to determine whether the import of the statements is such that it would furnish a foundation for proof of conduct, and it is then for the jury to decide whether the accused was aware the statements were made, whether, under all the circumstances shown, they called for a disclaimer, whether the accused did reply to them, and whether if he did not do so, such failure showed criminal intent or a consciousness of guilt. If these propositions of fact are resolved in favor of the prosecution the item of conduct should be given the effect to which upon the entire case it is entitled."

Here, had the defendant promptly denied the accusations, there would have been no reaction to show or admission to introduce, and the statements could not properly have been received in evidence. But the defendant's remarks did not constitute a full and prompt denial. In response to one accusation he said, "I have told you all I am going to tell you. Somebody stole my car, and that is all I have to say." With respect to the Woods statement he commented in part, "Well, she told enough . . . I have nothing more to say," and in response to the Webb statement, he said in part, "It looks like he told it all and about everybody."

The equivocal remarks, such as, "Well, she told enough," were stronger against defendant than if he had stood mute or said he had no reply to make. A comment such as, "I have nothing more to say," is not a denial of an accusation. (*People* v. *Edwards*, 72 Cal.App. 102, 123 [236 P. 944].) In *People* v. *Egan*, 77 Cal.App. 279, 282-3 [246 P. 337], where the defendant's reply to an accusatory statement was that he "had nothing to say," it was held that the statement was properly received in evidence. The court said: "The accusatory statement in the instant case was read to appellant in the presence of Wright, and appellant, being asked if he had anything to say, was fairly afforded an opportunity to make a reply. If, under those conditions, he made no reply to the accusatory statements, the circumstance of his silence was proper evidence to be considered by the jury as indicating an admission of guilt." (See, also, *People* v. *Egan*, 133 Cal.App. 152, 156,

158 [23 P.2d 1042]; *People* v. *Marineau,* 55 Cal.App.2d 893, 905 [132 P.2d 22].)

It is argued that because the defendant was represented by the public defender the rule requiring timely objection in the trial court to the introduction of evidence should not be applied. The majority opinion does not meet this issue squarely, but states: "Assuming this to be so, none of the matters urged by present counsel appear to have prejudiced defendant."

The assumption may not be indulged. The public defender is subject to the same rules as any other counsel, as is also his client; hence failure of the public defender to object to the questioned evidence when it was offered should foreclose the consideration of the point on appeal. The argument here made with respect to the status of the public defender was considered in the recent case of *In re Hough,* 24 Cal.2d 522, 528-529 [150 P.2d 448], and this court there said:

". . . When the public defender is appointed to represent a defendant accused of a crime, he becomes the attorney for said defendant for all purposes of the case and to the same extent as if regularly retained and employed by the defendant. The judge of the trial court has no more authority or control of him than he has of any other attorney practicing before his court. The public defender is free from any restraint or domination by the district attorney or of the prosecuting authorities. He is as free to act in behalf of his client as if he had been regularly employed and retained by the defendant whom he represents. Were it not so his client would not be afforded the full right 'to have assistance of counsel for his defense' which the Constitutions, both state and federal, give to one accused of crime. With such plenary powers given a public defender when appointed to defend one accused of crime, it necessarily follows that no act of his in advising his client or in defending the latter upon the charge against him can be considered in any different light than if such act were performed by an attorney regularly employed and retained by the defendant. In no sense can it be held that the prosecuting officers of the county are in any respect charged with the consequences of such an act. The contention therefore that the petitioner is not bound by his pleas of guilty, on the ground that in so pleading he was misled by the advice of the public defender acting as his attorney, is not well taken."

The record fails to show any error in the trial of the case.

Spence, J., concurred.